Case No. 19-99005

United States Court of Appeals
for the Ninth Circuit

| | |
|---|---|
| Tracy Allen Hampton, | D.C. No. 2:14-cv-02504 (D. Ariz.) |
| Petitioner-Appellant, | Hon. Roslyn O. Silver |
| vs. | |
| | DEATH PENALTY CASE |
| David Shinn, Director, Arizona Department of Corrections, et al., | |
| Respondents-Appellees. | |

Appeal from the United States District Court
for the District of Arizona

**Petition for Panel Rehearing and/or Rehearing En Banc**

Gregory Cui
Warrington Sebree
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
501 H Street NE, Ste. 275
Washington, D.C. 20002

Rene L. Valladares
  Federal Public Defender

Randolph M. Fiedler
David Anthony
Stacy M. Newman
  Assistant Fed. Public Defenders

FEDERAL PUBLIC DEFENDER FOR
  THE DISTRICT OF NEVADA
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
randolph_fiedler@fd.org

*Counsel for Petitioner-Appellant*

# TABLE OF CONTENTS

Table of Contents ...................................................................... ii

Table of Authorities................................................................. iii

Rule 40(b)(2) Statement ........................................................... 1

Background............................................................................... 2

Argument.................................................................................. 6

I.   The panel created a circuit conflict by wrongly upholding the determination that counsel made a tactical decision. .................... 7

II.  The panel created a circuit conflict by inventing new reasons to justify the state court's decision.................................................. 12

    A.   The panel failed to confine its analysis to the state court's actual reasoning. .................................................................. 12

    B.   Even the reasons added by the panel cannot justify counsel's deficient performance................................................. 17

III. Trial counsel's deficient performance caused the wrongful conviction of an innocent person.................................................. 21

Conclusion ............................................................................. 23

TABLE OF AUTHORITIES

**Supreme Court Cases**

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ....................................... 10, 11

*Harrington v. Richter*, 562 U.S. 86 (2011) ........................................... 16

*Wilson v. Sellers*, 584 U.S. 122 (2018) ................................................. 12

**Federal Court Cases**

*Branch v. Sweeney*, 758 F.3d 226 (3d Cir. 2014) ........................ 9, 10, 21

*Cook v. Kernan*, 948 F.3d 952 (9th Cir. 2020) ..................................... 16

*Crace v. Herzog*, 798 F.3d 840 (9th Cir. 2015) ................................. 7, 17

*Dennis v. Sec'y, Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016) ..... 14, 15, 16

*Doe v. Ayers*, 782 F.3d 425 (9th Cir. 2015) ............................................ 9

Duncan v. Ornoski, 528 F.3d 1222 (9th Circ. 2008) .............................. 9

*Edwards v. Lamarque*, 475 F.3d 1121 (9th Cir. 2007) ........................... 7

*Flores-Rivera v. United States*, 16 F.4th 963 (1st Cir. 2021) .............. 20

*Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) ..................... 2, 12, 14, 17

*Hampton v. Shinn*, 143 F.4th 1047 (9th Cir. 2025) .................... *passim*

*Heishman v. Ayers*, 621 F.3d 1030 (9th Cir. 2010) ................................ 9

*Hernandez v. Chappell*, 923 F.3d 544 (9th Cir. 2019) ................. 1, 9, 10

*Jefferson v. GDCP Warden, 941* F.3d 452, (11th Cir. 2019) ................ 10

*Kipp v. Davis*, 971 F.3d 939 (9th Cir. 2020) ........................................ 16

*Porter v. Coyne-Fague*, 35 F.4th 68 (1st Cir. 2022) ............................. 14

*Pye v. Warden, Diagnostic Prison*, 50 F.4th 1025 (11th Cir. 2022) ...... 15

*Sanchez v. Davis*, 994 F.3d 1129 (9th Cir. 2021) ................................. 16

*Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019) .......................................... 14

*Springs v. Payne*, 95 F.4th 596 (8th Cir. 2024) .................................... 15

*Subdiaz-Osorio v. Humphreys*, 947 F.3d 434 (7th Cir. 2020) .............. 15

*Tamplin v. Muniz*, 894 F.3d 1076 (9th Cir. 2018) ................................ 12

*Thompson v. Skipper*, 981 F.3d 476 (6th Cir. 2020) ............................ 15

*Tyler v. Hooks*, 945 F.3d 159 (4th Cir. 2019) ....................................... 15

*United States v. Shepherd*, 880 F.3d 734 (5th Cir. 2018) ..................... 10

*Uvukansi v. Guerrero*, 126 F.4th 382 (5th Cir. 2025) ........................... 15

*Witherspoon v. Stonebreaker*, 30 F.4th 381 (4th Cir. 2022) ................ 10

*Wood v. Carpenter*, 907 F.3d 1279 (10th Cir. 2018) ............................ 15

*Zornes v. Bolin*, 37 F.4th 1411 (8th Cir. 2022) .................................... 15

## Statues

28 U.S.C § 2254 ................................................................................. 2, 14

RULE 40(b)(2) STATEMENT

Rehearing is warranted in this capital case because, as Judge Friedland recognized, Hampton's claim of ineffective assistance of counsel is so compelling that it requires relief even under the "highly deferential standard" of AEDPA. *Hampton v. Shinn*, 143 F.4th 1047, 1094 (9th Cir. 2025) (Friedland, J., dissenting). Indeed, the evidence that trial counsel failed to present shows that Hampton did not commit the crimes for which he is sentenced to die. *See id.* (expressing "serious doubt that Hampton committed the murders").

Preventing an innocent person from being executed is reason enough to rehear, but the panel's decision especially requires rehearing because it created two conflicts with circuit precedent. First, the panel wrongly speculated that trial counsel made a strategic decision not to call key witnesses, even though trial counsel unequivocally testified that no strategic decision was made. *See, e.g.*, *Hernandez v. Chappell*, 923 F.3d 544, 550–51 (9th Cir. 2019) ("Where, as here, it would contradict [counsel's] testimony to presume that counsel's conduct was strategic when counsel clearly stated otherwise, we are guided by counsel's own statements." (cleaned up)). Second, the panel improperly

1

invented new justifications for the state court's decision, rather than reviewing the state court's explicit reasoning. *See, e.g.*, *Frantz v. Hazey*, 533 F.3d 724, 738 (9th Cir. 2008) (en banc) ("[I]f we were to defer to some *hypothetical* alternative rationale when the state court's *actual* reasoning evidences a § 2254(d)(1) error, we would distort the purpose of AEDPA."). Ultimately, none of the panel's new justifications excuse trial counsel's unreasonable failure "to present testimony from two witnesses that another person committed the murders at issue and testimony from a third witness that cast doubt on the credibility of the State's star witness." *Hampton*, 143 F.4th at 1094 (dissent).

Rehearing is necessary to maintain uniformity in this Court's law and prevent a grave miscarriage of justice.

## Background

Tracy Hampton was convicted of capital homicide based on the testimony of one witness who "was intoxicated on methamphetamines at the time of the murder." *Hampton*, 143 F.4th at 1095 (dissent). There was no "physical evidence linking Hampton to the killings," *id.*, and the State's other witness, George Ridley, was so "thoroughly impeached" that the panel found that *Brady* and *Napue* violations concerning him

2

were harmless, *id.* at 1098. As a result, the State's hopes rested on one witness, Misty Ross, who claimed that she witnessed the murders. *Id.* at 1098; *see* Oral Arg. 28:42–59, 38:35–43:20 (Judge Friedland noting the State's concession that "their only evidence is Ross").[1]

Against the State's threadbare case, however, Hampton called Mark Sandon, who claimed that, about a month or two after the murders, he was in a motel room and heard "Tim Wallace, whom Sandon had never met before, confess to the murders." *Hampton*, 143 F.4th at 1096 (dissent). But as the State noted at oral argument, Sandon was "on the periphery," having no real connection to Hampton, Wallace, or the crimes. Oral Arg. 30:12–30. At trial, the State seized upon this to argue Sandon's seemingly out-of-left-field testimony was implausible. *Hampton*, 143 F.4th at 1096 (dissent).

In fact, Sandon's testimony was only implausible due to trial counsel's failure to present other critical witnesses; the jury should

---

[1] In dismissing Hampton's claim that Ridley perjured himself, the panel majority repeatedly used plural nouns to suggest multiple sources of evidence implicating Hampton's guilt. *See Hampton*, 143 F.4th at 1070 ("But where, as here, multiple *witnesses* implicate a defendant in a crime . . . . "); *id.* ("direct evidence from other *sources* . . . ."). But it was only Ross: one witness, one source.

never have had to weigh his testimony in isolation against the State's minimal case. Rather, three witnesses could have proven Wallace was the real killer and tipped the scales decisively for Hampton.

*First*, Jennifer Doerr could have testified that Ross later admitted she did not "know who did it." 7-ER-1879. Doerr recalled how "every single time" Ross described the murder, the story "changes." 7-ER-1880. When Doerr pressed Ross on the details, she collapsed in tears and revealed, "I don't know who it was, I don't know who did it. . . . I can't remember, I can't remember." 7-ER-1893; *see* 8-ER-1910.

*Second*, Kiva Armijo could have testified that he also heard Wallace admit "he was the person that actually killed" the victims. 7-ER-1727. Unlike Sandon, Armijo actually knew Hampton, Wallace, and people in their circle, and therefore it was easier to understand how she could have been present for Wallace's confession. 7-ER-1728; 7-ER-1735. Armijo could also have added important details about the confession, explaining that Wallace was in business with one of the victims and suspected him of snitching. 7-ER-1729. Armijo heard Wallace boast that he committed the murders but someone else had "already taken the rap, blame." 7-ER-1732.

4

*Finally*, yet another witness, whose identity has been protected, corroborated Armijo's account of Wallace's confession. 7-ER-1826. This Witness could have testified that Wallace agreed that "Tracy didn't do it" because it was Wallace who killed them. *Id.* Wallace warned that anyone who talked would be "dealt with just the way he dealt with" the victims. *Id.*

Given the "remarkably weak evidence" at trial, there was no strategic reason not to call these witnesses, and Hampton's attorneys confirmed this. *Hampton*, 143 F.4th at 1094 (dissent). Maria Schaffer was responsible for the third-party defense, and she testified unequivocally that the failure to call the Doerr, Armijo, and Witness was "[n]ot a tactical decision." 32-ER-9162–63. In her words: "[F]rankly, I failed to investigate fully the third-party defense for this case." *Id.*

The state post-conviction court, however, concluded that it was "not bound by Ms. Schaffer's subjective belief," and speculated that lead counsel James Logan decided not to call the witnesses because they had "not actually witnessed the murders," "may have been friends" with Hampton, "may have been using meth," and may have offered "contradictory or potentially-inadmissible evidence." 12-ER-3125–26.

5

The court acknowledged that Logan testified to no such thing—indeed, he stated that his "practice was to discuss strategy with the team," and he recalled no strategic discussion about these witnesses. 12-ER-3125.

Over Judge Friedland's dissent, the panel majority similarly rejected "Schaffer's statements at the evidentiary hearing," concluding they "do not move the ball on Hampton's IAC claim." *Hampton*, 143 F.4th at 1079. Accordingly, the panel upheld the state court's determination that counsel made a strategic decision, and that the decision was reasonable. *Id.* at 1080, 1082. In doing so, the panel relied not only on the state court's reasoning, but on new justifications that, in the panel's view, an attorney could have had for not calling the witnesses. *Id.* at 1079–80.

## ARGUMENT

Rehearing is warranted to prevent the panel's decision from creating two significant conflicts with circuit precedent and to ensure that an innocent person is not executed.

**I.   The panel created a circuit conflict by wrongly upholding the determination that counsel made a tactical decision.**

Before deciding whether an attorney acted reasonably, courts must determine, as a factual matter, whether the attorney made a tactical decision or an unintentional error. *See Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007). That determination is critical because an attorney "receives no deference" under *Strickland* for unintentional errors. *Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2014).

Here, the state post-conviction court made an unreasonable factual determination that counsel's failures to call the three witnesses "were tactical decisions." 12-ER-3126. That squarely contradicted the testimony of Hampton's attorney, Maria Schaffer, that the omissions were "[n]ot a tactical decision." 32-ER-9162–63.

Instead of crediting Schaffer's unequivocal testimony, the state court speculated about reasons that Logan may have had for not calling the witnesses. *See Hampton*, 143 F.4th at 1081. But Logan's testimony confirmed that neither he nor Schaffer made a strategic decision. Logan's practice was to "have discussions with [his] team and [his] client" before making strategic decisions. *See* 32-ER-9101. His

7

contemporaneous records also showed that he found the witnesses compelling: After speaking with Armijo, for example, Logan specifically requested further investigation and wrote in his notes, "Tim Wallace is the Guy." 7-ER-1745; 7-ER-1749; 7-ER-1751. But consistent with Schaffer's testimony, Logan could not recall a strategic conversation about the witnesses or a strategic reason why the witnesses were not called. 32-ER-9080–81.[2] That is because Logan never "communicate[d] the bits and pieces that he knew" to Schaffer, much less made a strategic decision not to call the witnesses. 32-ER-9160–63.

Nevertheless, the state court determined that counsel made a tactical decision, and the panel wrongly upheld this determination. *See* 12-ER-3126. Like the state court, the panel speculated that Logan must have "made the ultimate decision about who to call to the stand" based on hypothesized reasons for such a decision. 143 F.4th at 1079, 1081.

In doing so, the panel contradicted this Court's repeated instruction that "we credit the statements of defense counsel as to

---

[2] In contrast, Logan specifically recalled speaking with Schaffer and relying "on Schaffer to make a recommendation" not to call a different witness. 32-ER-9139; *see* 32-ER-9167 (Schaffer testifying she "made the final decision" not to call the witness).

whether their decisions at trial were—or were not—based on strategic judgments," especially where "it would contradict [counsel's] testimony to presume that counsel's conduct was strategic when counsel clearly stated otherwise." *Hernandez*, 923 F.3d at 550–51 (quoting *Doe v. Ayers*, 782 F.3d 425, 445 (9th Cir. 2015); *see Duncan v. Ornoski*, 528 F.3d 1222, 1237 n.7 (9th Cir. 2008) (rejecting "speculative justifications" for counsel's decision).

For example, in *Hernandez*, trial counsel admitted that he failed to present evidence because "he was ignorant of the law." 923 F.3d at 550. The State, however, proposed "hypothetical strategic choices that could have supported counsel's conduct." *Id.* This Court refused to adopt these hypotheticals because doing so would have contradicted counsel's express testimony. *Id.*; *see also Doe*, 782 F.3d at 445 n.28 ("[T]here is no reason to conclude that J.B. was not telling the truth when he acknowledged his deficient performance."); *Heishman v. Ayers*, 621 F.3d 1030, 1040 (9th Cir. 2010) (rejecting hypothesized strategy that would "contradict [counsel] Keep's testimony").

The panel also created a split with precedent from this Court's sister circuits, which also credit counsel's explicit testimony. *See Branch*

*v. Sweeney*, 758 F.3d 226, 242 (3d Cir. 2014) (rejecting state courts'
"theoretical justifications" as "sheer speculation"); *Witherspoon v.
Stonebreaker*, 30 F.4th 381, 388, 397 (4th Cir. 2022) (finding state
decision "patently unreasonable" in light of counsel's testimony that she
"should have" raised an objection); *United States v. Shepherd*, 880 F.3d
734, 741–42 (5th Cir. 2018) (relying on counsel's testimony that he "did
not read any case law" and had "no strategic reason"); *Jefferson v.
GDCP Warden*, 941 F.3d 452, 479 (11th Cir. 2019) (citing counsel's
testimony that decision was "the result of neglect—rather than a
strategic decision").

The panel's justifications for its decision are unavailing. First, the
panel interpreted *Pinholster* to require that courts "affirmatively
entertain[] the range of possible 'reasons [Hampton's] counsel *may* have
had.'" 143 F.4th at 1080. But that is true only where *Strickland*'s
presumption of competence applies. *See Cullen v. Pinholster*, 563 U.S.
170, 196 (2011) (citing presumption of "reasonable professional
judgment"). That presumption applies only to "strategic choices," not
errors based on ignorance or oversight. *See Hernandez*, 923 F.3d at 550.

10

No amount of hypothesizing can convert an unintentional error into a strategic choice.

Second, the panel cited *Pinholster* for the proposition that "'[a] handful of *post hoc* nondenials by one of [Hampton's] lawyers' is not enough to 'rebut the presumption of competence.'" 143 F.4th at 1079. That reasoning does not apply here because Schaffer's testimony, far from a "nondenial," was an explicit denial of any strategic decision. In *Pinholster*, by contrast, the attorney stated only that he had "no recollection" of a penalty-phase investigation, while his billing records showed that he had conducted one. 563 U.S. at 194. Here, both Schaffer's and Logan's testimony, as well as Logan's contemporaneous records, show that no strategic decision was made.

By squarely contradicting counsel's testimony that this was "[n]ot a tactical decision," 32-ER-9162–63, the panel created a circuit conflict. For this reason, rehearing should be granted.

11

## II.   The panel created a circuit conflict by inventing new reasons to justify the state court's decision.

In addition, rehearing should be granted because the panel created a second circuit conflict by going beyond the state court's reasoning and inventing new justifications for its decision.

### A.   The panel failed to confine its analysis to the state court's actual reasoning.

In *Wilson v. Sellers*, 584 U.S. 122 (2018), the Supreme Court made clear that, under AEDPA, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.* at 125. That means the federal court must "confine" its "analysis to the state court's *actual* decisions and analysis." *Tamplin v. Muniz*, 894 F.3d 1076, 1086 (9th Cir. 2018) (quoting *Frantz*, 533 F.3d at 738).

Here, the state court concluded that trial counsel reasonably failed to call the witnesses on four grounds: (1) they did not witness the murders, (2) they may have been friends with Hampton, (3) they may have been using meth, and (4) they may have offered contradictory testimony. 12-ER-3125–26.

But as Judge Friedland explained, none of these reasons justified omitting these witnesses. In terms of not witnessing the murders, for example, the exact same thing could be said of the witness that counsel did call, Sandon. *Hampton*, 143 F.4th at 1099 (dissent). As to the witnesses' friendship with Hampton, the same could be said of the State's star witness, Ross, who was also a member of Hampton's social circle. *Id.* at 1099. Indeed, the prosecution specifically cited Sandon's lack of connection to the group as a reason to doubt his testimony. *Id.* at 1096; *see* 27-ER-7574 (State arguing that Sandon was "talking about somebody he never knew"). As to meth use, the same could be said of *both* Sandon *and* Ross. *Hampton*, 143 F.4th at 1099 (dissent). And as to potential inconsistencies, regardless of any minor differences, the witnesses could have corroborated Sandon's critical testimony by showing that "Wallace confessed on multiple occasions." *Id.* These witnesses may not have been immune from cross-examination, but compared to the weak evidence at trial, they were game changers.

Perhaps sensing the weakness of the state court's reasons, the panel improperly invented new ones. The panel speculated that Logan declined to call Armijo, for example, because she was in a halfway house

13

and had "warrants" of some kind. *Id.* at 1079. The panel also theorized that Armijo and Doerr relied too much on stories they had heard, rather than personal knowledge, and that Doerr's fear for her safety "could have undermined Doerr's credibility and value as a witness." *Id.* The panel even assumed that even if the witnesses had been pursued, "that investigation would not have been fruitful." *Id.* at 1080.

None of these "*hypothetical* alternative rationale[s]" may be considered under this Court's caselaw. *Frantz*, 533 F.3d at 738. AEDPA narrows a federal court's inquiry to the reasons given by the state court, and inventing new justifications "would require us to ignore rather than respect the state court's analysis." *Id.* Therefore, this Court "confine[s] our § 2254(d)(1) analysis to the state court's *actual* decisions and analysis." *Id.* at 737.

Most other circuits follow the same approach. *Porter v. Coyne-Fague*, 35 F.4th 68, 75 (1st Cir. 2022) ("[A] federal habeas court simply reviews the specific reasons given by the state court."); *Scrimo v. Lee*, 935 F.3d 103, 111 (2d Cir. 2019) (asking whether the state court's "rationale was contrary to, or represented an unreasonable application of, clearly established federal law"); *Dennis v. Sec'y, Pa. Dep't of Corr.*,

14

834 F.3d 263, 281–82 (3d Cir. 2016) (en banc); *Tyler v. Hooks*, 945 F.3d 159, 167 (4th Cir. 2019); *Uvukansi v. Guerrero*, 126 F.4th 382, 388 (5th Cir. 2025) ("[W]e consider the lower court's actual reasoning."); *Thompson v. Skipper*, 981 F.3d 476, 480 (6th Cir. 2020) ("Hewing to *Wilson*, this court recently explained that AEDPA requires a habeas court to review the actual grounds on which the state court relied." (internal quotation marks omitted)); *Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 443 (7th Cir. 2020) ("[W]e will focus on that [state court] decision and simply review the specific reasons given by the state court." (cleaned up)); *Wood v. Carpenter*, 907 F.3d 1279, 1294 n.12 (10th Cir. 2018) ("AEDPA requires us to review the OCCA's opinion").[3] As the Third Circuit held en banc, "federal habeas review does not entail speculating as to what other theories could have supported the state

---

[3] Contrary to the majority of circuits, the Eleventh Circuit held that federal courts may consider "any potential justification for" a state court's decision. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc). As the dissenting judges explained, *Pye* is incompatible with the Supreme Court's instructions in *Wilson. See id.* at 1064–65 (J. Pryor, J., dissenting). The Eighth Circuit, in dicta, has suggested it also looks beyond the reasons given in a state court opinion. *See Zornes v. Bolin*, 37 F.4th 1411, 1415 (8th Cir. 2022); *but see Springs v. Payne*, 95 F.4th 596, 601 (8th Cir. 2024) (citing *Wilson* and *Zorne* without addressing discrepancy between the two).

court ruling when reasoning has been provided, or buttressing a state court's scant analysis with arguments not fairly presented to it." *Dennis*, 834 F.3d at 281–82.

The panel interpreted *Harrington v. Richter*, 562 U.S. 86 (2011), to require there not be "a single reasonable argument that—not one— Hampton's counsel performed adequately at the guilt phase," and criticized the dissent for failing to apply this standard. *Hampton*, 143 F.4th at 1080. But the majority here is wrong: *Harrington* addressed a situation in which there had been no reasoned state court decision. *See* 562 U.S. at 98 (addressing circumstances "[w]here a state court's decision is unaccompanied by an explanation"). In that context, the Court held that "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105. Accordingly, this Court has reserved *Harrington* for cases with unexplained decisions. *See Sanchez v. Davis*, 994 F.3d 1129, 1138 (9th Cir. 2021); *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020); *Cook v. Kernan*, 948 F.3d 952, 966 (9th Cir. 2020).

In contrast, when there is a reasoned decision from the state court, as here, courts must limit their review to "the state court's *actual*

16

reasoning." *Frantz*, 533 F.3d at 738. By going well beyond the state court's reasoning, the panel created a circuit conflict. For that reason, rehearing is necessary.

**B.   Even the reasons added by the panel cannot justify counsel's deficient performance.**

In any case, the panel's new justifications cannot save trial counsel's deficient performance. Failing to call these critical witnesses in light of the weak evidence presented at trial was "manifestly unreasonable even if we thought that [counsel] had consciously chosen not" to do so. *Crace*, 798 F.3d at 852.

*First*, the panel reasoned that "[t]he record reveals an extensive investigation by Hampton's trial counsel to follow up on the Wallace-as-murderer theory." *Hampton*, 143 F.4th at 1078. But, as the dissent notes, Logan's investigation was cursory, at best, and led him to believe that further investigation was necessary. *Id.* at 1100 (dissent). In addition, Logan did not share his information with Schaffer, "the lawyer tasked with developing Hampton's third-party defense." *Id.* So she could not conduct any follow-up investigation needed to make a strategic decision about the witnesses.

17

*Second*, the panel claimed that any follow-up investigation "would not have been fruitful." *Hampton*, 143 F.4th at 1080. But additional investigation would have corroborated Wallace's motive: For example, Wallace's belief that one of the victims was an informant was supported by the fact that Findley was arrested without charges around the same time that Wallace was caught with methamphetamines. 18-ER-5192–5198; 19-ER-5212; 19-ER-5219; 19-ER-5259. Additionally, as noted by the dissent, further investigation "could have provided more information about Hampton's and Wallace's relationships with the victims to make the third-party defense more coherent and believable." *Hampton*, 143 F.4th at 1098 (dissent).

*Third*, the majority suggested that Armijo, Witness, and Doerr were unwilling to testify. *Id.* at 1080 (maj. op.). But as the dissent noted, that suggestion was speculative. *Id.* at 1100 (dissent). Indeed, far from being unwilling to participate, Armijo later testified that she attended the first day of Hampton's trial. 7-ER-1764. All three witnesses, moreover, cooperated when state and federal post-conviction counsel conducted their investigation. *See* 7-ER-1757 (Armijo); 17-ER-4897 (Doerr); 7-ER-1781 (Witness). "The fact that Hampton's counsel

had trouble reaching potential witnesses on the eve of trial, multiple months after they had spoken, is more indicative of counsel's failure to properly pursue and prepare the witnesses than of their unwillingness to testify." *Id.* at 1100 (dissent).

*Fourth,* the panel speculated about concerns Logan may have had about the witnesses, such as the facts that Armijo was in a halfway house, had warrants, and that her allegations that Findley owed Wallace money were not based on personal knowledge. *Hampton*, 143 F.4th at 1079. But these concerns do not withstand scrutiny. Placement in a halfway house and unspecified warrants are a weak basis for impeachment, if they could even have been used at all; evidence of "prior bad acts" are of "doubtful" "relevance and admissibility." *Id.* at 1080 (dissent). Moreover, trial counsel did not even know about Armijo's drug use. *Compare* 7-ER-1760 *with* 7-ER-1726 *and* 7-ER-1749; 7-ER-1751. Similarly, Armijo did not tell trial counsel or his investigator that Findley owed Wallace money. *Compare* 16-ER-4574 *with* 7-ER-1726 *and* 7-ER-1749; 7-ER-1751. Thus, any concerns about those details could not have influenced counsel's decision.

*Finally*, the panel suggested that Doerr's reluctance to share details in a tape-recorded statement conveyed "trepidation" that "could have undermined Doerr's credibility and value as a witness." *Hampton*, 143 F.4th at 1079. But Doerr ultimately provided that information to the defense investigator once the tape was off. *Compare* 7-ER-1883 *with* 7-ER-1744. And any trepidation could have been explained to the jury, and in fact would have been consistent with the threats Wallace made in front of Witness.

In the end, as the dissent rightly concluded, "given the weakness of the evidence presented at trial," failing to call these three critical witnesses "was objectively unreasonable." *Hampton*, 143 F.4th at 1100. The panel theorized that trial counsel chose to rely solely on the testimony of Sandon to make Hampton's third-party defense, rather than present a full defense using these compelling, corroborating witnesses. "That choice resembles rejecting a lifeboat in favor of two lily pads." *Flores-Rivera v. United States*, 16 F.4th 963, 970 (1st Cir. 2021).

## III. Trial counsel's deficient performance caused the wrongful conviction of an innocent person.

Rehearing is also warranted because "there is a reasonable probability that Hampton would not have been found guilty if Hampton's counsel had presented the additional witnesses."[4] *See Hampton*, 143 F.4th at 1100 (dissent). Indeed, "it is difficult to see how the jury could have returned a guilty verdict" if it had heard their testimony. *Branch v. Sweeney*, 758 F.3d 226, 236 (3d Cir. 2014) (explaining that uncalled witnesses exonerating the defendant could not be deemed cumulative because their testimony "went to the very heart of the prosecution's case by identifying another person as the shooter").

Only two witnesses implicated Hampton in these homicides, Ross and Ridley. Ridley was a jailhouse informant who received a plea agreement to testify that Hampton confessed when the two shared a jail cell. 26-ER-7291; 26-ER-7329–30. As the majority noted, and as conceded by the State, Ridley's testimony was so thoroughly impeached that no juror would have credited it. 1-ER-61; 143 F.4th at 1065. That

---

[4] Because the state post-conviction court did not address prejudice, this Court applies *de novo* review. *Hampton*, 143 F.4th at 1100 n.5 (dissent).

left only Ross's testimony, which was inconsistent with the crime scene, 25-ER-7252, and was undermined by her methamphetamine use both at the time of the crime and during her testimony, 26-ER-7531.

If Hampton's counsel were effective, Ross's testimony would have paled in comparison to the fully developed third-party defense. As the dissent explained:

> Doerr, if called, would have testified that the State's most important witness, Ross, had contradicted herself by saying previously that she did not know who committed the murders. Given that Ridley was completely impeached, impeaching Ross's account of the murders would have left the prosecution with essentially no credible evidence against Hampton at all. And Armijo and Witness would have significantly strengthened Hampton's third-party culpability defense by corroborating Sandon's testimony through additional evidence that Wallace had confessed to the murders. If the jury heard from those witnesses, there is a reasonable probability that they would have acquitted Hampton.

*Hampton*, 143 F.4th at 1101. So compelling was the evidence counsel failed to present that it caused Judge Friedland to conclude: "My own study of the record has certainly left me doubting that Hampton actually committed these murders." *Id.*

## CONCLUSION

Based on the foregoing, Hampton requests rehearing or rehearing en banc.

Dated this September 19, 2025

Respectfully submitted,

Rene L. Valladares
   Federal Public Defender

*/s/ Randolph M. Fiedler*
Randolph M. Fiedler
David Anthony
Stacy M. Newman
   Assistant Federal Public Defenders

FEDERAL PUBLIC DEFENDER FOR THE
   DISTRICT OF NEVADA
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
randolph_fiedler@fd.org

Gregory Cui
Warrington Sebree
RODERICK & SOLANGE
   MACARTHUR JUSTICE CENTER
501 H Street NE, Ste. 275
Washington, D.C. 20002

*Counsel for Petitioner*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* https://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** 19-99005

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,187 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/ Randolph M. Fiedler **Date** 9/19/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11** *Rev. 12/01/24*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TRACY ALLEN HAMPTON, AKA Tracy A. Hampton, | No. 19-99005 |
| *Petitioner-Appellant*, | D.C. No. 2:14-cv-02504-ROS |
| v. | |
| DAVID SHINN, Director, Arizona Department of Corrections; RON CREDIO, Warden, Arizona State Prison - Eyman Complex, | OPINION |
| *Respondents-Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted December 12, 2024
Pasadena, California

Filed July 8, 2025

Before:  Milan D. Smith, Jr., Michelle T. Friedland, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson;
Dissent by Judge Friedland

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Tracy Allen Hampton's federal habeas petition filed under 28 U.S.C. § 2254 challenging his Arizona murder convictions and death sentence for the killing of Charles Findley, Tanya Ramsdell, and Ramsdell's unborn child.

Hampton raised four certified claims on appeal. The panel held that each lacked merit. The State did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), or *Napue v. Illinois*, 360 U.S. 264 (1959), in connection with the testimony of a jailhouse informant. And Hampton was not prejudiced by his trial counsel's alleged failure to obtain evidence that could have been used to impeach the informant on the stand. Nor were Hampton's defense counsel constitutionally ineffective at the guilt or sentencing phases of his trial. And while Hampton sought evidentiary development on his *Brady*, *Napue*, and ineffective assistance of counsel claims, the district court acted within its discretion in denying the request. Because Hampton did not make a substantial showing of the denial of a constitutional right, the panel declined to expand the certificate of appealability to include his uncertified claims.

Dissenting, Judge Friedland would grant the petition. She wrote that Hampton's defense attorneys were constitutionally defective at the guilt phase because they failed to present testimony from two witnesses that another

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

person committed the murders and testimony from a third witness that cast doubt on the credibility of the State's star witness. She would hold that there is no reasonable justification for counsel's failure to call those witnesses, particularly given the remarkably weak evidence that supported Hampton's conviction. Even under the highly deferential applicable standard of review, she thinks Hampton has a valid habeas claim and has serious doubt that Hampton committed the murders.

## COUNSEL

Randolph Fiedler (argued), David Anthony, and Stacy M. Newman, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Federal Public Defender for the District of Nevada, Las Vegas, Nevada; for Petitioner-Appellant.

Jason D. Lewis (argued), Section Chief Counsel; Jeffrey L. Sparks, Acting Chief Counsel; Capital Litigation Section; Mark Brnovich, Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; for Respondents-Appellees.

## **OPINION**

R. NELSON, Circuit Judge:

In 2002, Tracy Allen Hampton was convicted of killing Charles Findley, Tanya Ramsdell, and Ramsdell's unborn child. A jury sentenced him to death. The Arizona Supreme Court affirmed Hampton's convictions and sentences on direct appeal and denied his petition for state post-conviction relief. Hampton then filed a federal habeas petition under 28 U.S.C. § 2254, which the district court denied.

Hampton raises four certified claims on appeal. Each lacks merit. The State did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), or *Napue v. Illinois*, 360 U.S. 264 (1959), in connection with the testimony of George Ridley, a jailhouse informant. And Hampton was not prejudiced by his trial counsel's alleged failure to obtain evidence that could have been used to impeach Ridley on the stand. Nor were Hampton's defense counsel constitutionally ineffective at the guilt or sentencing phases of his trial. And while Hampton sought evidentiary development on his *Brady*, *Napue*, and ineffective assistance of counsel claims, the district court acted within its discretion in denying the request. Finally, because Hampton has not made a substantial showing of the denial of a constitutional right, we decline to expand the certificate of appealability to include his uncertified claims. We affirm.

I

A

In May 2001, law enforcement tried to serve a traffic ticket on Tracy Allen Hampton at a house in Phoenix, Arizona. Hampton had been living at the house with Charles

Findley and Findley's girlfriend, Tanya Ramsdell, who was five months pregnant. Hampton was not home when the officers arrived, but Findley was. To convince the officers that he was not Hampton, Findley showed them Hampton's photograph. The officers left.

Early the next morning, Shaun Geeslin and Misty Ross—both Hampton's friends—went to the house. When they arrived, Findley and Ramsdell were still asleep. So was Tim Wallace, a local drug dealer spending the night with his girlfriend, Stephanie Lopez, who also lived at the house. Hampton, who had since returned to the house, let Ross and Geeslin in, told them about the police visit from the day before, and said that he would confront Findley about sharing information with the police. When Findley awoke, Hampton and Geeslin spoke with him.

The residents and visitors, except for Ramsdell, spent most of the morning getting high on methamphetamine. Sometime after 10:30 a.m., Hampton and Geeslin left the house. They returned around noon and entered a back room where Findley was kneeling on the floor putting together a lighter. Ross was there too. Hampton turned on a CD player, walked in front of Findley, and called out his name. As Findley looked up, Hampton shot him in the head.

Geeslin looked at Ross and said, "It's time to go." Hampton began following them out of the house, but then stopped and said, "Wait, we have one more." He turned down the hallway and walked to the bedroom where Ramsdell was sleeping. Hampton slammed open the door; Ramsdell screamed for him to get out. Hampton then shot Ramsdell in the head, killing her and her unborn child.

After the murders, Hampton joined Ross and Geeslin in Geeslin's truck, where he asked Ross if any blood was on his

face. The group drove to another house where Hampton and Geeslin took showers and changed clothes. Hampton commented, "What, I killed two people." The group parted ways later that evening. Before leaving, Hampton told Ross, "Don't worry. You were never there."

Hampton was arrested two weeks later. While awaiting trial in the Maricopa County jail, Hampton shared a cell with George Ridley. Ridley later testified that Hampton confessed to the murders every night for two weeks. Hampton told Ridley that he killed Findley because he "was a rat." And he apparently killed Ramsdell because he was affiliated with the Aryan Brotherhood and thought she was a "Niger lover" who was pregnant with a black man's child. Hampton also told Ridley that he "thought it was funny" Ramsdell had slept through her boyfriend's murder, and that he was "good enough" to "get her in the same place he did her old man." Before leaving the house, Hampton knelt next to Findley's body and whispered, "I just want to let you know I took care of your nigger loving old lady and her little coon baby, too. But don't worry. They didn't feel a thing."

B

The State charged Hampton with two counts of first-degree murder for the killings of Findley and Ramsdell, and one count of manslaughter for the killing of Ramsdell's unborn child. The State also gave notice that it would seek

the death penalty. *See* Ariz. Rev. Stat. Ann. § 13-703(A) (2001).[1] The case proceeded to trial before an Arizona jury.[2]

The State relied mainly on the testimony of two witnesses: George Ridley and Misty Ross. Ridley testified about Hampton's pre-trial confessions. And Ross recounted how she watched Hampton execute Findley and then listened as he did the same to Ramsdell. The State argued that Hampton killed Findley because he "snitched" to the police about the traffic ticket. And it maintained that Hampton killed Ramsdell because he thought "she was carrying a black baby." The jury later learned through autopsy and crime scene photos that all three victims, including Ramsdell's child, were white.

Hampton's defense focused on impeaching Ridley and Ross. The defense impeached Ridley with his criminal history, which included multiple convictions for stalking his ex-wife, and the possibility of receiving probation for testifying in Hampton's case. The defense also proposed that Ridley obtained details about the murders not from his

---

[1] Arizona has since renumbered its death penalty statutes. *See* Ariz. Rev. Stat. Ann. § 13-751. We use the statutory references in effect when Hampton was sentenced.

[2] Capital proceedings in Arizona have three phases: guilt, aggravation, and penalty. *McGill v. Shinn*, 16 F.4th 666, 674 n.2 (9th Cir. 2021); *see* Ariz. Rev. Stat. Ann. § 13-703(A)–(C) (2001). The guilt phase is straightforward: Is the defendant guilty or innocent? At the aggravation phase, the jury decides whether the prosecution has proven at least one statutory aggravating factor beyond a reasonable doubt. Ariz. Rev. Stat. Ann. § 13-703(B), (F)(1)–(14) (2001). If so, at the penalty phase, the jury weighs any mitigating factors in deciding whether the defendant should be sentenced to death. *Id.* § 13-703(C) (2001). Unless otherwise noted, we refer to the last two phases—aggravation and penalty—as the sentencing phase.

conversations with Hampton, but from police reports that Hampton kept in their shared jail cell. As for Ross, the jury was told about her drug use, including that she was smoking methamphetamine shortly before the murders. The defense suggested that Ross was high during her testimony, telling the jury to ask itself why she was "fidgeting," "squinting," and "smil[ing] inappropriately." Finally, the defense elaborated on Ross's potential biases—she could have carried a grudge against Hampton, for example, because he connected Ramsdell with Findley, whom Ross had previously dated.

Hampton also pinned the killings on Tim Wallace, the drug dealer who slept at the house and was smoking methamphetamine on the morning of the murders. According to Mark Sandon, Hampton's acquaintance, he heard Wallace confess to the murders some months later while dropping off drugs at a local motel.

The jury rejected the defense theory and convicted Hampton on all counts. The case moved to the aggravation phase. In Arizona, before imposing the death penalty, the sentencer must find at least one statutory aggravating circumstance beyond a reasonable doubt. *See State ex rel. Thomas v. Granville*, 123 P.3d 662, 666 (Ariz. 2005); Ariz. Rev. Stat. Ann. § 13-703(B), (E), (F) (2001). The State alleged two aggravating circumstances: multiple homicides, Ariz. Rev. Stat. Ann. § 13-703(F)(8) (2001), and commission of an offense in an "especially heinous, cruel or depraved manner," *id.* § 13-703(F)(6) (2001).

When Hampton was convicted, Arizona law required the sentencing judge to find the aggravating circumstance for death eligibility. *See id.* § 13-703(C) (2001). The United States Supreme Court later invalidated that aspect of

Arizona's capital sentencing scheme, holding that because the enumerated aggravating circumstances operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury, not a judge. *Ring v. Arizona* (*Ring I*), 536 U.S. 584, 609 (2002) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). Hampton's sentencing phase was therefore conducted before a new jury.

After hearing from many of the same witnesses who testified at the guilt phase, the sentencing-phase jury found the aggravator of multiple murders for the killings of Findley and Ramsdell. For the heinous-or-depraved aggravator, the jury concluded that Hampton "relished the murder" of Ramsdell and that the "killing was senseless because it was unnecessary to achieve [Hampton's] criminal purpose, or [Ramsdell] was helpless because she was unable to resist."

In mitigation, Hampton's counsel described a childhood tainted by substance abuse, mental illness, and sexual violence. The State's substantial rebuttal evidence included testimony from Hampton's ex-girlfriend, who described repeated beatings by Hampton and other violent acts. Hampton apparently told her, "The reason you live is you have my Aryan baby." And she added that Hampton confessed shortly after the murders, which she later recanted.

The sentencing phase concluded with Hampton's unsworn statement to the jury. "I offer no excuses, explanation for what occurred," Hampton said. "Three human beings are dead and I was convicted for it. I know there must be a punishment for the crime." Hampton also offered an apology: "And the amount of grief and the losses of children, I apologize for my involvement."

The jury sentenced Hampton to death for the murders of Findley and Ramsdell, finding that his mitigation evidence did not warrant leniency.  The judge also sentenced Hampton to 12.5 years' imprisonment for the manslaughter of Ramsdell's unborn child.  On direct appeal, the Arizona Supreme Court (ASC) affirmed Hampton's convictions and sentences.[3]  *State v. Hampton*, 140 P.3d 950, 968 (Ariz. 2006).  The United States Supreme Court denied certiorari.  *Hampton v. Arizona*, 549 U.S. 1132 (2007).

C

In 2011, Hampton filed an amended petition for post-conviction relief in Maricopa County Superior Court (the PCR court).  His petition raised six claims, four of which the PCR court summarily dismissed as not colorable or procedurally barred.  The two remaining claims alleged ineffective assistance of counsel (IAC) at the guilt and sentencing phases of Hampton's trial.  Hampton argued that his trial counsel were ineffective for failing to call specific witnesses who could support his third-party culpability defense and raise a reasonable doubt about his guilt.  He also argued that the same counsel were ineffective at sentencing because they failed to present sufficient mitigation evidence through the testimony of mental health experts.  In 2013, the PCR court held a five-day evidentiary hearing on the two IAC claims, which included testimony from Hampton's trial counsel, multiple mental health specialists, and an expert on

---

[3] The ASC struck the heinous-or-depraved aggravator because the jury instructions allowed the jury to find the aggravator based on "relishing" that occurred months after the crime, instead of at or near the time of the murders.  *Hampton*, 140 P.3d at 960.  But the court still upheld the death sentences based on the remaining multiple-homicides aggravator.  *Id.* at 966–68.

prevailing death-penalty defense standards. The PCR court
later denied Hampton's IAC claims in a reasoned order,
concluding that his trial counsel were not constitutionally
ineffective at the guilt or sentencing phase. The ASC
summarily denied Hampton's petition for review.

Hampton timely sought federal habeas review under 28
U.S.C. § 2254. His petition alleged 39 claims for relief,
including the guilt- and sentencing-phase IAC claims
previously denied by the PCR court. The district court
denied Hampton's motion for a stay and abeyance to return
to state court to exhaust claims first raised in his federal
habeas petition. *Hampton v. Ryan*, No. cv-14-2504, 2016
WL 3653965, at *1 (D. Ariz. July 8, 2016); *see Rhines v.
Weber*, 544 U.S. 269, 277–78 (2005). In February 2019, the
district court denied Hampton's petition in full, including a
motion for evidentiary development. *Hampton v. Ryan*,
No. cv-14-2504, 2019 WL 979896, at *35 (D. Ariz. Feb. 28,
2019). It also declined to issue a certificate of appealability
(COA). *Id.* The district court later denied Hampton's Rule
59(e) motion to alter or amend the judgment, and Hampton
timely appealed.

## II

### A

The Antiterrorism and Effective Death Penalty Act of
1996 (AEDPA) governs our review of federal habeas corpus
proceedings.[4] *See Gonzalez v. Thaler*, 565 U.S. 134, 140
(2012). We lack jurisdiction to "entertain an appeal from a
'final order in a habeas corpus proceeding'" until a petitioner

---

[4] Hampton filed his federal habeas petition in 2016, well after AEDPA's
April 24, 1996, effective date. *See Clark v. Broomfield*, 83 F.4th 1141,
1147 (9th Cir. 2023).

obtains a COA from a federal district or circuit judge. *Rose v. Guyer*, 961 F.3d 1238, 1243 (9th Cir. 2020) (quoting 28 U.S.C. § 2253(c)(1)(A)); *see* Fed. R. App. P. 22(b)(1). The COA requirement serves a critical "gatekeeping function." *Gonzalez*, 565 U.S. at 145. By "screen[ing] out issues unworthy of judicial time and attention," the COA procedure ensures "that frivolous claims are not assigned to merits panels." *Id.*

Because the district court denied a COA, Hampton asked this court to permit an appeal from the denial of his federal habeas petition. A motions panel granted Hampton's request for a COA and certified four claims for appeal. We have jurisdiction over these claims under 28 U.S.C. § 1291 and § 2253. *See Catlin v. Broomfield*, 124 F.4th 702, 721 (9th Cir. 2024).

Hampton identifies several other uncertified claims, some of which were already raised in his counseled request for a COA. We construe Hampton's briefing on these issues "as a motion to expand the certificate of appealability." *Floyd v. Filson*, 949 F.3d 1128, 1152 (9th Cir. 2020) (citing 9th Cir. R. 22-1(e)); *see also* Fed. R. App. P. 22(b)(2).

AEDPA permits expansion of the COA only "where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting 28 U.S.C. § 2253(c)(2)). This requires the petitioner to show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.* at 327.

## B

Although we "review a district court's denial of a 28 U.S.C. § 2254 petition de novo," we review Hampton's claims under AEDPA's deferential standard of review. *Catlin*, 124 F.4th at 721 (quoting *Fauber v. Davis*, 43 F.4th 987, 996 (9th Cir. 2022)). AEDPA "guard[s] against extreme malfunctions in the state criminal justice systems"—it is not "a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)). To that end, we may only grant habeas relief for claims adjudicated on the merits in state court if the decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2); *see Harrington*, 562 U.S. at 97–98.

"Under § 2254(d)(1), 'clearly established' 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Marks v. Davis*, 106 F.4th 941, 949 (9th Cir. 2024) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)). "A state court's decision is contrary to clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Ochoa v. Davis*, 50 F.4th 865, 876 (9th Cir. 2022) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 413 (2000)). "A state court's decision is an unreasonable application of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case.'" *Id.* (quoting *Terry Williams*, 529 U.S. at 413). These standards are "difficult to meet" and are satisfied only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 102. AEDPA relief requires more than just an "incorrect or erroneous" state-court decision; the "state court's application of clearly established law must be objectively unreasonable." *Lockyer*, 538 U.S. at 75.

Under § 2254(d)(2), a state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). We accord state courts "substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). Even if "'reasonable minds reviewing the record might disagree' about the finding in question," that still "'does not suffice to supersede the trial court's determination.'" *Id.* (cleaned up) (quoting *Wood*, 558 U.S. at 301).

Because the ASC summarily denied Hampton's petition for state post-conviction relief, we "look through" to the "last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). So for those claims adjudicated in state court, we apply AEDPA deference to the PCR court's reasoned denial of post-conviction relief. *See Murray v. Schriro*, 745 F.3d 984, 1006 (9th Cir. 2014).

### III

We begin with Hampton's four certified claims. Hampton first alleges that the State's presentation of Ridley's testimony violated his constitutional rights. He

then asserts that his trial counsel were constitutionally ineffective during both the guilt and sentencing phases of his trial. Lastly, we certified for appeal whether the district court abused its discretion in denying Hampton's motion for evidentiary development. Each claim fails.

A

Start with Hampton's challenge to Ridley's testimony. This claim, listed in Hampton's § 2254 petition as Claim 2, has three subparts. Claim 2(A) alleges that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing a presentence investigation report (PSI) prepared for Ridley's sentencing on theft and stalking charges. In Claim 2(B), Hampton alleges that the State knowingly offered Ridley's perjured testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). And Claim 2(C) contends that Hampton's trial counsel were ineffective because they failed to obtain the PSI and present it during the guilt and sentencing phases.

Hampton did not raise Claim 2 in state court. That prompts a host of complicated issues. As a rule, a "federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court." *Peterson v. Lampert*, 319 F.3d 1153, 1155 (9th Cir. 2003) (en banc) (citing 28 U.S.C. § 2254(b)). This requirement "is 'grounded in principles of comity' as it gives states 'the first opportunity to address and correct alleged violations of state prisoner's federal rights.'" *Wooten v. Kirkland*, 540 F.3d 1019, 1023 (9th Cir. 2008) (quoting *Coleman v. Thompson*, 501 U.S. 722, 731 (1991)).

That said, a claim may be "technically" exhausted if an "independent and adequate state procedural ground[]" bars the petitioner from returning to state court to exhaust remedies that were otherwise forfeited. *Rodney v. Garrett*,

116 F.4th 947, 954 (9th Cir. 2024) (citing *Coleman*, 501 U.S. at 729–32). The Arizona Rules of Criminal Procedure, for example, provide that a petitioner is barred from relief on any claim that could have been raised on direct appeal or in a prior post-conviction petition. Ariz. R. Crim. P. 32.2(a)(3); *see Martinez v. Ryan*, 566 U.S. 1, 10 (2012) ("There is no dispute that Arizona's procedural bar on successive petitions is an independent and adequate state ground."). When such rules preclude relief in state court, the claim is "procedurally defaulted." *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (en banc) (citing *Coleman*, 501 U.S. at 735 n.1). And absent an exception, "[w]e may not reach the merits of procedurally defaulted claims." *Williams v. Stewart*, 441 F.3d 1030, 1061 (9th Cir. 2006) (per curiam). For example, a "prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S. at 10.

The parties agree that Claim 2 is technically exhausted because Arizona law bars Hampton from obtaining post-conviction relief based on his failure to raise Claim 2 in his original state post-conviction proceedings. *See* Ariz. R. Crim. P. 32.2(a)(3) (no post-conviction relief "based on any ground . . . waived at trial or on appeal, or in any previous post-conviction proceeding"). So Claim 2 is procedurally defaulted. *Smith*, 510 F.3d at 1139.

That remains true despite our recent decision in *Doerr v. Shinn*, 127 F.4th 1162 (9th Cir.), *petition for reh'g en banc pending*, Nos. 09-99026, 10-99007, and 20-99002 (Mar. 26, 2025). There, as here, the petitioner raised a new claim before a federal habeas court that had not been raised in Arizona post-conviction proceedings. 127 F.4th at 1167. The district court in *Doerr* also concluded that the petitioner's claim was procedurally defaulted because he had

not raised it in his original state post-conviction petition, and because Arizona law "generally precludes Arizona courts from hearing postconviction claims that were or could have been raised in a prior postconviction petition." *Id.* (citing Ariz. R. Crim. P. 32.2(a)(3)).

The similarities end there. The *Doerr* petition was filed at a time when federal habeas law was in flux. While the petitioner's first appeal was pending, the Supreme Court decided *Martinez*, which "effectively eliminated" the district court's basis for rejecting the petitioner's argument for excusing the procedural default. *Id.* at 1168. We later remanded the *Doerr* petition to the district court so that court could hear new evidence under case law that has since been overruled. *Id.* (citing *Detrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013) (en banc), *overruled in part by Shinn v. Ramirez*, 596 U.S. 366, 382 (2022)). On remand, the petitioner offered evidence for his new claim that, today, could not be considered under Supreme Court precedent. *Id.* at 1168–69, 1173.

Because of these unique circumstances, we questioned in *Doerr* whether an Arizona court would enforce the state's procedural default rule, thus rendering the petitioner's new claim technically exhausted. *Id.* at 1171. Our hesitation largely stemmed from the fact that the petitioner had already presented evidence on that claim—evidence that district courts are now barred from considering. *Id.* at 1173.

We also relied on two ASC decisions that set out narrow exceptions to procedural default for when the purposes of the rule are not served by circumstances beyond the petitioner's control. *See id.* at 1171–72 (citing *State v. Anderson*, 547 P.3d 345, 348–51 (Ariz. 2024); *State v. Diaz*, 340 P.3d 1069, 1070–71 (Ariz. 2014)). Still, we did not backtrack from our

default understanding that Arizona law generally precludes later post-conviction relief where the petitioner failed to raise a claim before the state courts. *See, e.g.*, *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013); *see also Doerr*, 127 F.4th at 1173 ("We do not, and need not, make [the] sweeping claim" that ineffective assistance of post-conviction counsel necessarily warrants an exception to preclusion.). It will be a rare case that is so similar to *Doerr* that there is even a question about whether Arizona's procedural default rule would apply. Because this case is not analogous to *Doerr*, we agree with the parties that an Arizona court would apply the state's procedural default rule to Claim 2.

Hampton presses several arguments for why he can overcome the procedural default. We choose not to address those arguments here. *See, e.g.*, *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002). Even if Hampton can overcome the default under a recognized exception, Claim 2 fails on the merits. Thus, reviewing de novo, we affirm the district court's denial of Claim 2.

1

Claim 2(A) argues that the State violated *Brady* by failing to disclose Ridley's PSI. In January 2002, Ridley pleaded guilty to stealing from his employer and stalking his ex-wife. The PSI, prepared in connection with Ridley's sentencing on these charges, included a victim statement raising doubts about whether Ridley would testify truthfully at Hampton's trial. When the probation officer told Ridley's ex-wife that Ridley was scheduled to testify in a murder trial, she flagged that "his recollection of events should be questioned" and "she does not believe he knows much of anything regarding [Hampton's] case." Ridley's ex-wife

described Ridley as "very system savvy" who "will say and do whatever is necessary to secure himself a good deal." And she "cautioned" the probation officer that "everything [Ridley] says should be suspect."

The probation officer agreed: she could not "in good conscience" recommend the plea agreement's stipulation to lifetime probation because Ridley "is willing to say or do just about anything to secure a positive outcome for himself." "It is believed," the probation officer wrote, that Ridley was "trying to gain his freedom so he may continue in his quest to see and be near his ex-wife." Only a prison sentence or 24/7 monitoring would prevent Ridley from "find[ing] a way to make contact" with his ex-wife.

Under *Brady*, the government must provide material exculpatory evidence to a criminal defendant. 373 U.S. at 87. This includes impeachment evidence. *See Giglio v. United States*, 405 U.S. 150, 153–54 (1972). Hampton maintains that the State violated *Brady* by not disclosing the PSI, knowing it would undermine Ridley's testimony by underscoring his motive to lie on the stand.

To succeed on his *Brady* claim, Hampton must establish three elements: "(1) the evidence is favorable to the accused, (2) the prosecution suppressed the evidence, and (3) the evidence is 'material.'" *Hooper v. Shinn*, 985 F.3d 594, 616 (9th Cir. 2021) (quoting *Brady*, 373 U.S. at 87).

The last element, materiality, is a formidable barrier to relief. Evidence is "material only if there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." *Garding v. Mont. Dep't of Corr.*, 105 F.4th 1247, 1259 (9th Cir. 2024) (alteration in original) (quoting *Amado v. Gonzalez*, 758 F.3d 1119, 1139 (9th Cir. 2014)), *cert. denied*,

No. 24-6837, 2025 WL 1151358 (U.S. Apr. 21, 2025). Or as the Supreme Court put it: "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (*Brady* violation requires showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). So even if the State suppressed Ridley's PSI, Hampton must still show a reasonable probability that he would not have been convicted had it been disclosed. *See id.*

To begin, the State does not dispute that Ridley's PSI is "favorable" evidence under *Brady*'s first prong. That leads to suppression. It is unclear when the State first possessed the PSI such that it had an obligation to disclose the report to the defense. The PSI was apparently written in January 2002, and Ridley's sentencing judge signed the report in March. Hampton's trial began in late April. The PSI was not publicly filed, however, until May 15, after Hampton was convicted and before the sentencing phase began.

Hampton asserts that the latest the State had access to the PSI—and thus should have produced it to the defense—was March 22, when Ridley's sentencing judge signed the report a month before Hampton's trial. *See Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor's decision not to preserve or turn over exculpatory material before trial . . . is a violation of due process under [*Brady*]."). This belief stems from the fact that the State's files, which were provided to defense counsel in discovery, contained an unsigned copy of the PSI. This suggests that the State had a

copy of the PSI before the probation officer signed it in January or when the judge signed it in March.

"The proponent of a *Brady* claim—i.e., the defendant—bears the initial burden of producing some evidence to support an inference that the government possessed or knew about material favorable to the defense and failed to disclose it." *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009). Once the defendant meets his burden, the government must "demonstrate that the prosecutor satisfied his duty to disclose all favorable evidence known to him or that he could have learned from 'others acting on the government's behalf.'" *Id.* (quoting *Kyles*, 514 U.S. at 437).

Hampton has met his initial burden. The unsigned copy of the PSI raises questions about whether the State had access to Ridley's PSI before Hampton's trial. And tellingly, the State does not maintain it was unaware of the PSI for purposes of *Brady*.[5] Instead, the State argues that it did not suppress the PSI as a legal matter because the impeachment information in the report was available to Hampton from other sources. *Cf. United States v. Agurs*, 427 U.S. 97, 103 (1976) (*Brady* applies only to "the discovery, after trial of information which had been known to the prosecution but unknown to the defense").

We need not decide whether that is true for the guilt phase. Assuming the PSI was suppressed during the guilt phase, it is not material under *Brady*. The "touchstone of materiality review" is "whether admission of the suppressed

---

[5] If all relevant agents of the government did not know about the *Brady* material, there can be no *Brady* violation. The "government has no obligation to produce information which it does not possess or of which it is unaware." *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995).

evidence would have created a reasonable probability of a different result." *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc) (cleaned up). When it comes to impeachment evidence, the materiality bar stands in the way if the suppressed evidence piles onto an already thoroughly impeached witness. *See United States v. Marashi*, 913 F.2d 724, 732 (9th Cir. 1990). For example, cumulative impeachment evidence cannot serve as the basis for a *Brady* violation when the grounds for impeachment are "no secret" to the jury. *United States v. Kohring*, 637 F.3d 895, 908 (9th Cir. 2011) (quotation omitted). And there is no *Brady* claim where the undisclosed evidence further corroborated impeachment already elicited at trial. *Barker v. Fleming*, 423 F.3d 1085, 1096–97 (9th Cir. 2005).

So too here. The PSI described cumulative impeachment evidence that would have reinforced what the jury already knew about Ridley's criminal history and motives to lie. Ridley, testifying in jail clothes, admitted on direct examination during the guilt phase that he was incarcerated on felony charges and was testifying pursuant to a plea agreement. Hampton's counsel stressed these points on cross-examination, ticking through Ridley's three prior felony convictions. Ridley was previously convicted of stalking in 1998 and was in jail on a different felony stalking charge when he shared a jail cell with Hampton. Hampton's counsel further impeached Ridley on his substance abuse (he was "binging on meth" prior to his arrest) and his jail cell access to police reports that detailed the allegations in Hampton's case.

Ridley was also cross-examined at length about his possible sentences if he did not testify at Hampton's trial. Ridley explained that he contacted police the same day he was moved out of the cell he shared with Hampton, told them

he had information on a murder, and discussed "working out
and resolving [his] problems." Ridley admitted that he
wanted to minimize his time in custody. He worked out a
deal "considerably better than the six-and-a-half years that
[he was] facing before [he] even got the stalking charge." As
part of that agreement, Ridley's sentencing was delayed until
after he testified at Hampton's trial. Ridley told defense
counsel he understood that arrangement was made because
the State wanted to confirm that he would implicate
Hampton in the murders before it recommended Ridley's
sentence. Ridley then admitted that had he had gone to trial,
he was prepared "to testify and say whatever it took to be
found not guilty."

Absent the PSI, Ridley was already "thoroughly
impeached and showcased as a self-serving jailhouse
snitch." *Barker*, 423 F.3d at 1101. As the district court
noted,[6] the information in the PSI was at best "duplicative of
impeachment already pursued at trial." *Hampton*, 2016 WL
3653965, at \*7 (quoting *Schad v. Ryan*, 671 F.3d 708, 715
(9th Cir. 2011), *overruled on other grounds by McKinney v.
Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc)).

The PSI would not have "provided the defense with a
new and different ground of impeachment." *Benn v.
Lambert*, 283 F.3d 1040, 1056 (9th Cir. 2002). That the
probation officer believed Ridley wanted to continue
stalking his ex-wife is just an additional basis to argue that

---

[6] Hampton argues that the district court applied the wrong legal standard
by referencing its previous order denying Hampton's request for a
*Rhines* stay to exhaust Claim 2(A) in state court. Not so. The district
court's order denying Claim 2(A) on the merits appropriately cited the
three-part *Brady* standard before referencing its prior finding that the
impeachment information in the PSI was cumulative to evidence already
presented to the jury. *Hampton*, 2019 WL 979896, at \*8.

Ridley was lying to avoid prison. Ridley testified
extensively about the charges against him and the likelihood
that he would be incarcerated for a long time. Ridley already
admitted that he sought a favorable plea agreement with the
State to reduce his sentence, and he conceded that he would
"testify and say whatever it took" to avoid incarceration.
More information about a precise reason why Ridley wanted
to avoid prison would have been cumulative to the extensive
testimony about Ridley's expressed desire to minimize his
time in custody.

We considered a similar situation in *Catlin*. The
petitioner there pointed to undisclosed documents
purportedly showing that a prosecution witness received
specific benefits in exchange for his testimony. 124 F.4th at
743. Assuming the evidence was favorable and that the state
suppressed it, we held that it was not material under *Brady*
because the witness's credibility "had already been seriously
challenged" with evidence that he had received other
benefits for testifying at the petitioner's trial. *Id.* at 744
(quoting *Rhoades v. Henry*, 598 F.3d 495, 504 (9th Cir.
2010)). "Evidence of additional benefits that [the witness]
may have received . . . would have been cumulative of other
impeachment evidence of the same type that was already
before the jury." *Id.* That is what happened here. The PSI's
suggestion that Ridley was looking to avoid incarceration to
continue stalking his ex-wife is "of the same type" as the
existing evidence that Ridley would fabricate his testimony
to reduce his sentence. *See id.*

In the end, the "mere possibility that an item of
undisclosed information might have helped the defense, or
might have affected the outcome of the trial, does not
establish 'materiality' in the constitutional sense." *Agurs*,
427 U.S. at 109–10. Hampton must show a "reasonable

probability" that he would not have been convicted had the PSI been disclosed. *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Because the information in the PSI was cumulative to the impeachment at trial, it is unlikely that the jury would have come to a different conclusion had it been aware of the report, especially considering the direct testimony from Ross implicating Hampton in the murders. The State therefore did not violate *Brady* during the guilt phase of Hampton's trial.

That leaves whether the State violated *Brady* by suppressing the PSI during the sentencing phase. Recall that the PSI was publicly filed on May 15, 2002—two weeks after Hampton's guilty verdict and before the sentencing phase began. Despite the public filing, the State did not provide the PSI to defense counsel at the time.[7]

But "where the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense." *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)). We ask, then, whether Hampton had enough information to use the evidence in the PSI to impeach Ridley at sentencing despite the State's failure to provide the report after the guilt phase.

Hampton's counsel knew or should have known of the impeachment evidence in the PSI during the sentencing phase. Two months before trial, the defense investigator gave Hampton's counsel a memorandum that listed Ridley's

---

[7] Hampton's state post-conviction counsel later admitted that he possessed Ridley's PSI and "simply overlooked it" in failing to raise Claim 2 in state proceedings. It is unclear how or when he obtained the report.

pending criminal charges and noted that the PSI on the stalking charge had not yet been filed.  The investigator also asked if defense counsel wanted her to track down Ridley's ex-wife.  Days later, a follow-up memorandum described Ridley's prior conviction for stalking the same ex-wife, which involved threatening to kill her son and taping a baby monitor under her trailer.  From these memoranda, Hampton's counsel knew that the PSI was being prepared, that Ridley had an extensive history of stalking his ex-wife, and that he had repeatedly violated the ex-wife's restraining order in the years before Hampton's trial.

At the time of trial, Hampton's counsel had a combined 37 years of criminal defense experience, much of which was in Arizona.  They would know that victims may provide a statement for the PSI and that the probation officer would offer her own assessment of Ridley's criminal history.  *See* Ariz. Rev. Stat. Ann. § 13-4424(A) (2001) ("The victim may submit a written impact statement or make an oral impact statement to the probation officer for the officer's use in preparing a presentence report.").  As the defense investigator suggested, Hampton's counsel could have interviewed Ridley's ex-wife and learned of her skepticism about his ability to tell the truth.  Indeed, the investigator noted that she "was not asked by anyone associated with Mr. Hampton's case to pursue the investigation [she] suggested be completed."

More to the point, defense counsel were aware from the investigator's memoranda that Ridley's PSI was in the works.  They knew it was being prepared in advance of Ridley's sentencing, and they knew that his sentencing had been delayed until after he testified at Hampton's trial.  As Hampton acknowledges, there was nothing to stop his counsel from accessing the publicly available PSI and using

it to impeach Ridley during the sentencing phase. Because
Hampton cannot show that the PSI was suppressed during
the sentencing phase, his *Brady* claim fails. *See United
States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985)
("[I]f the means of obtaining the exculpatory evidence has
been provided to the defense, the *Brady* claim fails.").

In short, the State did not violate *Brady* by failing to
disclose Ridley's PSI. The extra impeachment evidence was
not material, assuming the State suppressed the PSI before
and during the guilt phase. And once the PSI became
publicly available post-verdict, Hampton's counsel—
knowing the PSI would likely include helpful impeachment
information from Ridley's ex-wife—had reason to obtain the
report. Thus, Hampton cannot show that the State
suppressed the PSI during the sentencing phase. Claim 2(A)
fails.

2

In Claim 2(B), Hampton contends that the State violated
*Napue* by knowingly presenting Ridley's perjured testimony
that he had never been violent against his ex-wife. During
redirect at the aggravation phase, the State and Ridley had
the following exchange:

> Q:   During cross-examination much was
>      gone over regarding your criminal
>      history?
>
> A:   Right.
>
> Q:   Were any of those violent crimes?
>
> A:   No.
>
> Q:   One was drugs, one was theft?

> A:    One was stalking.
>
> Q:    The stalking involved who?
>
> [overruled objection]
>
> A:    No, none of that was violent, and it was
>       my ex-wife.
>
> Q:    You sort of answered this, I will ask it
>       another way.  Specifically, did you ever
>       commit any violence against your ex-
>       wife?
>
> A:    No.

Hampton maintains that Ridley's testimony was false. According to Ridley's PSI, he once drove toward his ex-wife's vehicle "at a high rate of speed" and "swerved in front of her and almost struck her car."  Earlier, a probation officer, writing in connection with a prior stalking conviction, noted that Ridley had at one point "smashed his [ex-wife's] bedroom window while she was talking to her son."  Based on these two incidents, Hampton contends that Ridley lied on the stand about having never committed violence against his ex-wife.  As the argument goes, the State violated Hampton's due process rights by declining to correct what it knew to be a lie.

"In *Napue*, the Supreme Court held 'that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'"  *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019) (quoting *Napue*, 360 U.S. at 269).  This principle applies even when "the falsehood bore upon [a] witness' credibility" and not the "defendant's guilt."  *Hayes v. Brown*,

399 F.3d 972, 986 (9th Cir. 2005) (en banc) (quoting *Napue*, 360 U.S. at 269).

A *Napue* claim succeeds only if Hampton shows: "(1) testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *Dickey v. Davis*, 69 F.4th 624, 636 (9th Cir. 2023) (quoting *Hayes*, 399 F.3d at 984). A *Napue* claim never succeeds if the defendant cannot prove actual falsity. *See Hein v. Sullivan*, 601 F.3d 897, 911 n.11 (9th Cir. 2010). "Testimony that is simply inconsistent or equivocal" may not be enough. *Catlin*, 124 F.4th at 741; *see United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014) ("Mere inconsistencies or honestly mistaken witness recollections generally do not satisfy the falsehood requirement." (citing *Bagley*, 473 U.S. at 678)).

Even assuming actual falsity, *Napue* does not create "a *per se* rule of reversal." *Hayes*, 399 F.3d at 984. The falsehood must be material. *Jackson v. Brown*, 513 F.3d 1057, 1075–76 (9th Cir. 2008). When reviewing for *Napue* materiality, we ask whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes*, 399 F.3d at 985 (quotation omitted). This materiality standard is "considerably less demanding" than its *Brady* counterpart. *Clements v. Madden*, 112 F.4th 792, 802 (9th Cir. 2024) (quoting *Dickey*, 69 F.4th at 637). But it still has serious kick: "[A] *Napue* claim fails if, absent the false testimony or evidence, the petitioner still received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Panah*, 935 F.3d at 664 (cleaned up).

To start, it is not clear that Ridley's testimony was actually false. *See Hein*, 601 F.3d at 911 n.11. Reasonable minds could debate whether the conduct described in Ridley's PSI amounted to "violence against [his] ex-wife." The prosecutor's questions—including whether Ridley had committed violence "against" his ex-wife—could be understood as an inquiry into Ridley's history of physical force. *See Violence*, Black's Law Dictionary (12th ed. 2024) (defining "violence" as the "use of physical force, usu[ally] accompanied by fury, vehemence, or outrage"). On that view, Ridley did not commit a violent crime; he swerved in front of his ex-wife's car, "almost struck [the] car," and then sped away. And while Ridley smashed his ex-wife's bedroom window while she was talking to her son, the PSI does not allege that Ridley caused any physical harm to his ex-wife's person. On another view, Ridley was violent because he engaged in threatening behavior toward his ex-wife despite not making physical contact.

This ambiguity about when someone commits violence proves the point. When a witness's testimony is susceptible to multiple interpretations—some of which are true and some of which are false—it will be difficult for a defendant to make out a *Napue* violation. *See Dickey*, 69 F.4th at 636 (testimony must be "actually false" (quotation omitted)); *see United States v. Lochmondy*, 890 F.2d 817, 823 (6th Cir. 1989) (rejecting *Napue* claim where testimony was not "indisputably false"). After all, there is no *Napue* claim unless the prosecution "knew or should have known that the [witness's] testimony was actually false." *Dickey*, 69 F.4th at 636 (quotation omitted). The prosecution cannot typically be expected to know when a witness has lied or told the truth if the testimony could be reasonably construed either way. *Cf. Clements*, 112 F.4th at 801–02 (*Napue* violation where it

was "quite clear" that a witness received benefits for testifying and lied in saying otherwise).

Hampton has not shown that the State "*knew* [Ridley's] testimony was inaccurate at the time he presented it." *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013). The district court noted that Ridley's testimony—while "objectively misleading"—may not have been false. *Hampton*, 2019 WL 979896, at *9. Given the phrasing, there may have been confusion between Ridley and the prosecutor about the exact substance of the question. Ridley could have reasonably thought he was being asked whether he had used physical force against his ex-wife. And the two incidents in the PSI did not involve physical force against another person. Hampton therefore has not established that Ridley's statements were actually false, or that the prosecution knew they were actually false. *Dickey*, 69 F.4th at 636. "At most, [Ridley's] testimony was 'inaccurate or rebuttable,' which is not enough to support a *Napue* claim." *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 831 (9th Cir. 2024) (first citing *Henry*, 720 F.3d at 1084; and then citing *Renzi*, 769 F.3d at 752), *cert. denied*, 145 S. Ct. 770 (2024).

Even so, if Hampton could show that the State knowingly presented false testimony from Ridley, that testimony would not be material. "A witness may be 'so thoroughly impeached' that even evidence of perjury at trial is 'merely cumulative.'" *Heishman v. Ayers*, 621 F.3d 1030, 1035 (9th Cir. 2010) (per curiam) (quotation omitted); *see also Morris v. Ylst*, 447 F.3d 735, 746 (9th Cir. 2006) (no *Napue* violation where "the jury already was shown that [the witness] was completely inconsistent and dishonest"). Moments before Ridley allegedly lied on redirect, Hampton's counsel peppered him with questions to impeach his credibility. Ridley admitted that he had been arrested

multiple times for stalking and possessing dangerous drugs
for sale. He acknowledged the plea deal he worked out in
exchange for testifying against Hampton would improve
"the more [his testimony] pleased the County Attorney's
Office." Ridley also answered in the affirmative when the
prosecutor questioned if Ridley "want[ed] to do everything
[he] could to minimize [his] stay in prison." And when
asked if he "had planned to go to trial to say whatever it took
to have [himself] found not guilty," Ridley replied, "Yes."

With this background, there is no reasonable likelihood
that the jury's impression of Ridley could have changed had
it known that he lied about committing violence against his
ex-wife. It was "no secret" that Ridley had the motive and
willingness to lie about Hampton's involvement in the
murders. *See Hovey v. Ayers*, 458 F.3d 892, 921 (9th Cir.
2006). By the time Ridley testified on redirect, the defense
had put on "an already strong case" that Ridley was "a
sophisticated actor who was manipulating the State for his
own gains." *Id.* That Ridley mischaracterized his history of
violence toward his ex-wife would not have altered the
jury's impression of his veracity. Even with evidence of
false testimony on Ridley's part, the jury would have still
sentenced Hampton to death.

*Glossip v. Oklahoma* does not alter our analysis. 145
S. Ct. 612 (2025). The Court granted a new trial under
*Napue* where the prosecution failed to correct false
testimony about a star witness's treatment for bipolar
disorder. *Id.* at 627. Central to the Court's materiality
analysis was that the witness's testimony "was the only
direct evidence" of the defendant's involvement in the
charged murder. *Id.* at 628. The jury's credibility
assessment was "necessarily determinative"; putting aside
the witness's testimony, no physical evidence or other

witness tied the defendant to the crime. *Id.* Thus, whether the jury convicted the defendant would rise and fall on whether it believed the star witness.

In that light, the Court was not persuaded that cumulative impeachment evidence—the witness had used illegal drugs and behaved impulsively—necessarily negated the evidentiary value of the sole witness's false testimony. *Id.* at 628–29. That makes sense. A new trial is warranted under *Napue* "so long as the false testimony 'may have had an effect on the outcome of the trial,'—that is, if it 'in any reasonable likelihood could have affected the judgment of the jury.'" *Id.* at 626–27 (cleaned up) (first quoting *Napue*, 360 U.S. at 272; and then quoting *Giglio*, 405 U.S. at 154). That analysis is straightforward enough when the testimony of one witness is the only direct evidence of a defendant's guilt. But where, as here, multiple witnesses implicate a defendant in a crime, the defendant will have a harder time showing that the jury's knowledge of any one witness's lie would have undercut the verdict obtained. *See Catlin*, 124 F.4th at 743 ("[W]hen there is substantial evidence of guilt, false testimony bearing on the credibility of a single witness is less likely to be material." (citing, *inter alia*, *Panah*, 935 F.3d at 664–66)).

Knowing that one witness gave false testimony, the jury could still convict the defendant based on other persuasive evidence. That goes to the crux of the materiality analysis: "[W]hat a reasonable decisionmaker would have done with the new evidence." *Glossip*, 145 S. Ct. at 629. In cases like this one, where a witness has been thoroughly impeached and there is direct evidence of guilt from other sources, the defendant must show a "reasonable likelihood" that the witness's false testimony "had an effect on the outcome of the trial" despite other evidence of his involvement in the

charged crime. *See Napue*, 360 U.S. at 271–72; *see also Phillips v. Ornoski*, 673 F.3d 1168, 1190–91 (9th Cir. 2012) (no *Napue* materiality because revealing the false testimony "could not have had any effect on the jury's determination that [the defendant] was guilty"). Hampton has not met that bar.

For these reasons, we conclude that the State did not violate *Napue*. Hampton has not shown that Ridley's testimony was false or that the State would understand it as such. And any false testimony is not material because there is no reasonable likelihood that it could affect the jury's decision to impose the death penalty. Putting aside Ridley's allegedly false testimony, Hampton still "received a fair trial" with "a verdict worthy of confidence."**[8]** *Panah*, 935 F.3d at 664 (quoting *Hayes*, 399 F.3d at 984). The district court did not err in rejecting Claim 2(B).

3

Claim 2(C) contends that Hampton's trial counsel rendered ineffective assistance under *Strickland v. Washington* by failing to obtain Ridley's PSI despite their obligation to conduct a reasonable investigation into Hampton's case. 466 U.S. 668 (1984). Based on the defense investigator's memoranda, Hampton's counsel knew that the

---

[8] That is true even if we consider the alleged *Brady* and *Napue* violations together. *See Phillips*, 673 F.3d at 1189 (when *Napue* claims and *Brady* claims are both raised, materiality is analyzed collectively). Each juror understood that Ridley had a history of saying what he needed to avoid prison. The verdicts would not have been affected had the State both disclosed Ridley's PSI and corrected his allegedly false testimony about whether he ever committed violence against his ex-wife. *See Sivak v. Hardison*, 658 F.3d 898, 914 (9th Cir. 2011) ("We reach the same result under *Brady* and our collective *Napue-Brady* analysis.").

PSI was being prepared for Ridley's sentencing. Though the investigator suggested that the defense team interview Ridley's ex-wife, counsel never tried to learn of her doubts about Ridley's willingness to tell the truth. The PSI was also publicly available when it was filed with Ridley's sentencing court after Hampton's guilt-phase verdict, meaning it was available for the sentencing phase. And yet Hampton's trial counsel never tracked down the report. Hampton argues that the failure to obtain the PSI was constitutionally deficient performance.

We need not resolve that matter, however, because Hampton was not prejudiced by his counsel's alleged errors. *See id.* at 687 ("[T]he defendant must show that the deficient performance prejudiced the defense."); *see also Catlin*, 124 F.4th at 726 ("A failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." (cleaned up)). That conclusion follows from the relationship between *Strickland* prejudice and *Brady* materiality. "Despite its differing terminology, prejudice in the IAC context mirrors the materiality standard under *Brady*." *Browning v. Baker*, 875 F.3d 444, 474 (9th Cir. 2017). So if suppressed evidence is not material under *Brady*, the failure to obtain that evidence cannot support an IAC claim. *United States v. Olsen*, 704 F.3d 1172, 1187–88 (9th Cir. 2013); *see Kyles*, 514 U.S. at 434.

We already explained why Ridley's PSI is not material under *Brady*: the cumulative impeachment evidence in the report would not have changed the jury's decision to convict Hampton. *See supra*, at 21–25. "[T]hat analysis is dispositive of the prejudice prong" of Hampton's IAC claim, at least with respect to the guilt phase. *Olsen*, 704 F.3d at 1188 (quotation omitted). For the sentencing phase, we concluded that the State had not suppressed the PSI for

purposes of *Brady*. *See supra*, at 25–27. Even so, for
Hampton's IAC claim, we reach the same conclusion on
materiality / prejudice for the sentencing phase as we did for
the guilt phase.**[9]** Given the cumulative nature of Ridley's
PSI, there is no "reasonable probability" that the jury would
not have sentenced Hampton to death had his counsel
accessed the report and used it to impeach Ridley at
sentencing. *See Strickler*, 527 U.S. at 281. In other words,
Hampton cannot show that he was prejudiced by his trial
counsel's allegedly deficient performance. *See Strickland*,
466 U.S. at 694–95. Claim 2(C) fails.

B

That brings us to Claim 3. Hampton alleges that his trial
counsel were ineffective at the guilt phase by failing to call
witnesses and present evidence that would have raised a
reasonable doubt about his guilt. Claim 3 focuses mainly on
a series of witnesses who would have allegedly supported
Hampton's third-party culpability theory. Most notable is
Keva Armijo, a friend of Hampton's who was known to the
defense investigator before trial. Armijo would have
testified that she overheard Tim Wallace confess to the
killings, that Wallace had a motive for the murders because
Findley owed Wallace money and was taking over his drug
business, that Ross held a grudge against Hampton that could
support a motive to lie, and that Hampton was "protective of
women" and would not have hurt Ramsdell.

Other witnesses could have similarly supported
Hampton's defense. An unidentified "Witness," known to

---

[9] In this context, "[t]he terms 'material' and 'prejudicial' are used
interchangeably." *Sivak*, 658 F.3d at 911 n.3 (quoting *Benn*, 283 F.3d at
1053 n.9). "Evidence is not 'material' unless it is 'prejudicial,' and not
'prejudicial' unless it is 'material.'" *Id.*

the defense team, would have described hearing Wallace accuse Findley of being a "snitch." Wallace also apparently boasted in Witness's presence about committing the murders. Jennifer Doerr, who was not present at the murders, would have testified that Ross gave evasive and inconsistent statements about who was responsible for the killings. And Wallace's girlfriend, Stephanie Lopez, would have explained how Ross may have lied to protect her boyfriend Geeslin, and that Wallace had urged her to leave the house before the murders because "something was going down."

Hampton further claims that his trial counsel, besides failing to present exculpatory witness testimony, declined to present other evidence favorable to his defense. Most of this evidence focused on Wallace and Geeslin's prior bad acts. For example, Wallace had been arrested for possessing a large quantity of methamphetamine, and Geeslin was a known member of the Aryan Brotherhood with "extreme violent tendencies dating back to 1990." Hampton also contends that his trial counsel failed to cross-examine Ross on her romantic relationship with Geeslin, while declining to put on evidence that the victims' autopsies revealed methamphetamine in their systems.

1

Hampton raised his guilt-phase IAC claim in state post-conviction proceedings. The PCR court held a five-day evidentiary hearing on the IAC claim, during which Hampton's trial counsel, James Logan and Maria Schaffer, testified. After the hearing, the PCR court denied Hampton's IAC claim on the merits in a reasoned opinion. The PCR court's factual findings are presumed correct and "may not be overturned unless rebutted by clear and

convincing evidence." *Rodriguez v. McDonald*, 872 F.3d 908, 919 (9th Cir. 2017); *see* 28 U.S.C. § 2254(e)(1).

The PCR court first analyzed the witness testimony proffered at the evidentiary hearing. It ticked through Armijo's allegations, including that "she heard Wallace say that he killed the victims" and that she had never seen Hampton "hurt anybody at all." But the court found that Witness, while corroborating Armijo's claims about Hampton's non-violent nature, would have also contradicted Armijo's testimony—both as to the location of Wallace's alleged confession and Findley's involvement in the drug trade. Doerr, the court noted, "would have testified to evasive and/or conflicting statements made to her" by Ross, assuming Doerr's testimony were deemed admissible. And Lopez would have testified that Wallace was "scared to death" of Hampton because he "had beat the crap out of [Wallace] before." The PCR court noted that this testimony, while presumably helpful to the defense, would conflict with Armijo and Witness's assertions about Hampton's propensity for violence.

Having summarized each witness's testimony, the PCR court turned to the merits of Hampton's IAC claim. Schaffer, Hampton's second-chair trial counsel, explained that she was responsible for the third-party defense for the guilt phase. Yet Schaffer testified that she "failed to investigate [the defense] fully" or properly communicate with Logan, the lead counsel. She maintained that the failure to present additional third-party defense evidence was not tactical.

The PCR court was not bound by Schaffer's subjective beliefs about the quality of her representation. *See Harrington*, 562 U.S. at 109–10 (the IAC analysis "calls for

an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind"). Instead, the court evaluated the collective defense effort, considering Logan's representation too. At the evidentiary hearing, Logan could not specifically remember Hampton's case. But he testified that his usual practice (which, at the time of Hampton's trial, included 28 years of criminal defense experience) was to make himself aware of potential witnesses via the investigator and to discuss strategy with the defense team.

Next, the PCR court explained that "while it may seem preferable to place a witness on the stand" and have their testimony scrutinized by the factfinder, trial counsel "may make a strategic decision not to do so based on numerous considerations." And in this case, "considerable impeachment [evidence]" existed for each potential witness. The witnesses who would testify to Wallace's alleged confession had not actually witnessed the murders. Many were Hampton's friends, suggesting bias. And some may have been using drugs at the time of the events to-be-testified-to, thus casting doubt on their credibility and the reliability of their observations. Trial counsel, the court explained, was required to weigh these facts when deciding whether to put the witnesses on the stand. Based on the evidence presented at the evidentiary hearing, the PCR court concluded that "the decision to call or to refrain from calling [the] witnesses and present evidence related to the third-party defense were tactical decisions, and that counsel was not ineffective for failing to call the identified witnesses."

In addition, the PCR court rejected Hampton's argument that his trial counsel were deficient for failing to present the extra evidence of Findley's and Wallace's criminal histories, Ross's romantic relationship with Geeslin, and the discovery

of methamphetamine during the victim's autopsies. None of that evidence, in the court's analysis, would have been admissible at trial.

Summing up, the PCR court held that trial counsel's investigation did not suggest deficient performance. Counsel was expected to conduct a reasonable and thorough investigation, "not an exhaustive investigation as to extraneous matters." Ultimately, the "decision[s] as to what witnesses to call, what evidence to present, and the scope of cross-examination were tactical decisions." Thus, Hampton's trial counsel were not ineffective at the guilt phase for failing to call the proffered witnesses or to present the extra evidence. The ASC summarily denied review.

Hampton again raised his guilt-phase IAC claim in his federal habeas petition. Apart from the witnesses identified in Hampton's state post-conviction petition, the federal petition argued that trial counsel were ineffective for "failing to present evidence from Bob Short, Miranda Clark, Edna Mitchell, Jared Dansby, and Steve Duran." According to Hampton, these extra witnesses would have further supported his innocence by corroborating the Wallace-as-murderer theory. The district court denied Claim 3, concluding that the state court's decision rejecting the claim was not unreasonable under AEDPA. *Hampton*, 2019 WL 979896, at \*12. We granted a COA.

2

Once again, the relevant law is *Strickland* and its progeny. Under *Strickland*, a petitioner must show that "(1) his trial counsel's performance 'fell below an objective standard of reasonableness' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bible*

*v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009) (quoting *Strickland*, 466 U.S. at 688, 694). "The 'ultimate focus' of the *Strickland* standard is 'the fundamental fairness of the proceeding whose result is being challenged.'" *Andrews v. Davis*, 944 F.3d 1092, 1108 (9th Cir. 2019) (en banc) (quoting *Strickland*, 466 U.S. at 696).

Our review under the deficient-performance prong is "highly deferential." *Miles v. Ryan*, 713 F.3d 477, 486 (9th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689). We measure counsel's performance against "prevailing professional norms" at the time of representation. *Avena v. Chappell*, 932 F.3d 1237, 1248 (9th Cir. 2019). In the process, we "indulge a strong presumption" that counsel's conduct fell "within the wide range of reasonable professional assistance." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 689). "[S]trategic choices made after thorough investigation" are "virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690).

*Strickland*'s deferential standard is magnified by AEDPA. Per § 2254(d)(1), we must "defer to the state court's decision unless its application of Supreme Court precedent was objectively unreasonable." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). This analysis layers onto *Strickland*'s deferential standard for assessing deficient performance, creating what the Supreme Court has termed "doubly deferential" review. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles*, 556 U.S. at 123). Under this approach, "the question is not whether counsel's actions were reasonable." *Harrington*, 562 U.S. at 105. "The question is whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (emphasis added).

Before getting to the merits, we must clarify what is before us on appeal. Section 2254(d) applies to Hampton's guilt-phase IAC claim because that claim was adjudicated on the merits in state court. *See Pinholster*, 563 U.S. at 187. And because the ASC summarily denied review of Hampton's guilt-phase IAC claim, we apply AEDPA to the last reasoned merits ruling—the decision from the PCR court. *Wilson*, 584 U.S. at 125.

Our review, however, is "limited to the record that was before the state court that adjudicated the claim on the merits." *Murray*, 745 F.3d at 998 (quoting *Pinholster*, 563 U.S. at 181). This mandate stems from AEDPA's "backward-looking language," which "requires an examination of the state-court decision at the time it was made." *Pinholster*, 563 U.S. at 182.

The requirement that we limit our AEDPA review to the state-court record clashes with Hampton's contention—first raised in his federal habeas petition—that trial counsel were also ineffective for failing to present evidence from five additional witnesses: Bob Short, Miranda Clark, Edna Mitchell, Jared Dansby, and Steve Duran. In a different era, we acknowledged a pathway for de novo review of IAC claims that included factual allegations not presented in state court. Under *Dickens v. Ryan*, a federal habeas court could consider new evidence supporting an IAC claim if the new evidence either "fundamentally altered the legal claim already considered by the state courts or placed the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." 740 F.3d 1302, 1318 (9th Cir. 2014) (en banc) (cleaned up). In either situation, "the new evidence transform[ed] the claim into a new claim that the state courts never had an opportunity to adjudicate on the merits." *Williams v. Filson*, 908 F.3d 546,

572–73 (9th Cir. 2018). The new claim was therefore unexhausted and, if it could no longer be raised in state-court proceedings, procedurally defaulted and technically exhausted as well. *Id.* at 573; *see Coleman*, 501 U.S. at 732. A petitioner could then overcome the procedural default by, for example, demonstrating that the default was caused by the ineffective assistance of his post-conviction counsel, *Martinez*, 566 U.S. at 17, and that he suffered actual prejudice, *Davila v. Davis*, 582 U.S. 521, 524 (2017). If the petitioner could clear those hurdles, he was entitled to de novo review of his "new" IAC claim. *Dickens*, 740 F.3d at 1321 (citing *Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002)).

Then came the Supreme Court's decision in *Shinn*. In *Shinn*, the Court addressed when federal courts may "hear a claim or consider evidence that a prisoner did not previously present to the state courts." 596 U.S. at 375–76. That question implicated § 2254(e)(2), which prohibits a district court from holding an "evidentiary hearing on [a] claim" if the petitioner "failed to develop the factual basis" of the claim in state-court proceedings, unless one of two strict exceptions applies, *id.* § 2254(e)(2)(A)(i)–(ii).

*Shinn* held that a petitioner "fails" to develop the state-court record under § 2254(e)(2) when he is "'at fault' for the undeveloped record in state court." 596 U.S. at 382 (quoting *Michael Williams v. Taylor*, 529 U.S. 420, 432 (2000)). The Court declined to impose a *Martinez*-like equitable exception to § 2254(e)(2) that would excuse a prisoner's failure to develop the state-court record because of the ineffective assistance of his post-conviction counsel. *Id.* at 385 ("§ 2254(e)(2) is a statute that we have no authority to amend"). Relatedly, the Court explained that a petitioner bears responsibility for his post-conviction counsel's

negligent failure to develop the state-court record, meaning the petitioner is still considered "at fault" for "fail[ing] to develop the factual basis of a claim in State court proceedings." *Id.* at 382 (first quoting *Michael Williams*, 529 U.S. at 432; then quoting § 2254(e)(2)).

The Court in *Shinn* also clarified the scope of § 2254(e)(2). While § 2254(e)(2) refers only to an "evidentiary hearing on [a] claim," *Shinn* reaffirmed that the statute also applies "when a prisoner seeks relief based on new evidence *without* an evidentiary hearing." *Id.* at 389 (emphasis added) (quoting *Holland v. Jackson*, 542 U.S. 649, 653 (2004)); *accord Lee v. Thornell*, 118 F.4th 969, 981 (9th Cir. 2024), *cert. denied*, No. 24-6668, 2025 WL 1549805 (U.S. June 2, 2025). Section 2254(e)(2)'s restrictions also kick in for evidentiary hearings "to assess cause and prejudice under *Martinez*." *Shinn*, 596 U.S. at 389; *see Shoop v. Twyford*, 596 U.S. 811, 823 (2022) ("[I]f § 2254(e)(2) applies and the prisoner cannot meet the statute's standards for admitting new merits evidence, it serves no purpose to develop such evidence just to assess cause and prejudice.").

Putting two and two together, *Shinn* says that if a prisoner or his post-conviction counsel failed to present new evidence to the state courts "in compliance with state procedural rules," 596 U.S. at 375–76, then there has been a "fail[ure] to develop the factual basis of a claim in State court proceedings," 28 U.S.C. § 2254(e)(2). The consequence under § 2254(e)(2) is that a federal habeas court "cannot hold an evidentiary hearing or otherwise consider [the] new evidence, either on the merits of the claim or to assess cause and prejudice under *Martinez*," unless the "stringent requirements" of § 2254(e)(2)(A) are met. *Rodney*, 116 F.4th at 955 (citing *Shinn*, 596 U.S. at 389).

Based on the Supreme Court's explanation, we held that *Shinn* abrogated *Dickens*'s holding that a petitioner's "'new evidence' could be considered as so 'fundamentally alter[ing]' his ineffective assistance claim that the augmented version of the claim should be considered a 'new claim'" potentially entitled to de novo review in federal court. *McLaughlin v. Oliver*, 95 F.4th 1239, 1250 (9th Cir.) (quotation omitted), *cert. denied*, 145 S. Ct. 598 (2024); *see also Lee v. Thornell*, 108 F.4th 1148, 1156 (9th Cir. 2024) ("Rejecting the reasoning of our post-*Martinez* decisions, the [*Shinn*] Court held that if section 2254(e) applies . . . 'a federal court may not hold an evidentiary hearing—or otherwise consider new evidence . . . .'" (quoting *Shinn*, 596 U.S. at 389)). *McLaughlin*'s holding follows from the interaction of *Shinn*, *Martinez*, and *Dickens*. As *Shinn* makes clear, under § 2254(e)(2), new evidence not presented in state court cannot be considered on the merits or "to assess cause and prejudice under *Martinez*." 596 U.S. at 389. So a "new" IAC claim under *Dickens* never gets off the ground—both because the new evidence is excluded from merits review and because a prisoner cannot use that evidence under *Martinez* to excuse a procedural default and capitalize on the de novo review that *Dickens* would have allowed.

What does this mean for Hampton? As his counsel recognized at oral argument, we cannot consider the new evidence of ineffective assistance that Hampton and his post-conviction counsel "failed to develop" before the state court—the testimony of Bob Short, Miranda Clark, Edna Mitchell, Jared Dansby, and Steve Duran. *See* 28 U.S.C. § 2254(e)(2); Oral Arg. at 1:11–1:37. Hampton's IAC claim does not qualify for one of § 2254(e)(2)'s exceptions. It does not rely on "a new rule of constitutional law." 28 U.S.C. § 2254(e)(2)(A)(i). Nor does it rely on "a factual predicate

that could not have been previously discovered through the exercise of due diligence." *Id.* § 2254(e)(2)(A)(ii). Thus, we consider, "through the deferential lens of AEDPA, whether the state court properly rejected [Hampton's] *original* trial-ineffective-assistance claim" based on the state-court record alone. *McLaughlin*, 95 F.4th at 1251; *see Lee*, 118 F.4th at 983.

### 3

#### a

Moving to the merits, Hampton first maintains that we may not give AEDPA deference because the PCR court misapplied *Strickland* to his guilt-phase IAC claim. This argument sounds in § 2254(d)(1)'s "contrary to" prong. Under that provision, we apply de novo review if the state court's resolution of a claim on the merits was "contrary to" clearly established federal law, as determined by the Supreme Court. *Terry Williams*, 529 U.S. at 406. A state court's decision is "contrary to" clearly established federal law if it fails to apply controlling authority, "applies a rule that contradicts the governing law," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court" and still arrives at a different result. *Id.* at 405–06. At bottom, "the 'contrary to' prong requires a direct and irreconcilable conflict with Supreme Court precedent." *Murray*, 745 F.3d at 997.

Hampton points to a passage from the PCR court's decision that he says is "contrary to" to *Strickland*. In discussing the presumption of reasonableness given to counsel's performance at *Strickland*'s first prong, the PCR court noted that it not only "'give[s] the attorneys the benefit of the doubt,' it must also 'affirmatively entertain the range of possible reasons [defense] counsel may have had for

proceeding as they did.'" In Hampton's view, courts "affirmatively entertain the range of possible reasons" only when (1) a *Strickland* claim is subject to AEDPA deference, and (2) when the state-court adjudication was a summary denial. Because the PCR court reviewed Hampton's claim on its merits without any form of deference, its recitation of *Pinholster*'s "affirmatively entertain" standard was allegedly "contrary to" clearly established federal law.

Hampton misreads *Pinholster*. The Supreme Court held that the court of appeals "misapplied *Strickland*" by overlooking "'the wide latitude counsel must have in making tactical decisions.'" 563 U.S. at 195 (quoting *Strickland*, 466 U.S. at 689). Specifically, the court of appeals did not "properly apply the strong presumption of competence that *Strickland* mandates." *Id.* at 196. The court of appeals "was required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons Pinholster's counsel may have had for proceeding as they did.'" *Id.* (first quoting *Pinholster v. Ayers*, 590 F.3d 651, 673 (2009) (en banc); then quoting *id.* at 692 (Kozinski, J., dissenting)). The *Pinholster* Court was not opining on AEDPA's extra-deferential standard of review under § 2254(d)(1). It was explaining how courts should "apply the strong presumption of competence" at the first step of *Strickland*'s merits analysis. *Id.* Thus, the PCR court properly quoted *Pinholster* for the substantive *Strickland* standard, not the doubly deferential AEDPA standard applied in federal habeas proceedings.

Our precedent reads *Pinholster* the same way. We routinely quote the "affirmatively entertain" language in assessing deficient performance as part of *Strickland*'s first-

step merits inquiry.[10]  *See, e.g.*, *Jurado v. Davis*, 12 F.4th
1084, 1100 (9th Cir. 2021); *see also Noguera v. Davis*, 5
F.4th 1020, 1050 (9th Cir. 2021) (considering "the range of
possible reasons" "[w]hen counsel's conduct is unexplained
in the record" (quotation omitted)).  We also "affirmatively
entertain the range of possible reasons" for counsel's actions
in non-AEDPA cases.  *See, e.g.*, *Washington v. Shinn*, 46
F.4th 915, 926–28 (9th Cir. 2022).  We therefore reject
Hampton's contention that the PCR court's quotation to
*Pinholster* as part of its *Strickland* merits analysis was
"contrary to" clearly established federal law.

b

Next, Hampton challenges the PCR court's resolution of
his   guilt-phase   IAC   claim   under   § 2254(d)(1)'s
"unreasonable application" prong.  As the Supreme Court
has told us specifically, an "*unreasonable* application of
federal law is different from an *incorrect* application of
federal law." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)
(quoting *Terry Williams*, 529 U.S. at 410).  "[A] prisoner
must show far more than that the state court's decision was
'merely wrong' or 'even clear error.'" *Shinn v. Kayer*, 592
U.S. 111, 118 (2020) (per curiam) (quoting *Virginia v.
LeBlanc*, 582 U.S. 91, 94 (2017) (per curiam)).  We may
grant relief only if "the state court's decision is so obviously
wrong that its error lies 'beyond any possibility for

---

[10] So do our sister circuits.  *See, e.g.*, *Gabrion v. United States*, 43 F.4th
569, 583 (6th Cir. 2022) ("affirmatively entertain[ing]" the reasons for
counsel's actions in a 28 U.S.C. § 2255 case); *Clark v. Thaler*, 673 F.3d
410, 418 (5th Cir. 2012) ("Under the deferential standard of *Strickland*,
we must 'affirmatively entertain the range of possible reasons
defendant's counsel may have had for proceeding as they did." (cleaned
up)).

fairminded disagreement.'" *Id.* (quoting *Harrington*, 562 U.S. at 103).

Under this deferential standard, Hampton has not shown that the PCR court unreasonably applied *Strickland*. The court weighed Hampton's argument that his trial counsel were ineffective for failing to call the extra witnesses who could support his third-party culpability theory. But as the PCR court recognized, it was required to presume that Hampton's counsel had strategic reasons for not calling these witnesses. After all, "strategic choices made after thorough investigation" are "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *see Catlin*, 124 F.4th at 727.

The presumption of reasonable performance "is even stronger when an experienced trial counsel is involved." *Ochoa*, 50 F.4th at 890. At the time of Hampton's trial, lead counsel Logan had 28 years of criminal defense experience, including as Chief Deputy at the Maricopa County Office of the Legal Advocate, where he ran the Office's criminal defense section. Some of his prior cases involved the death penalty. Schaffer was also an experienced criminal defense attorney. Over nine years, she had defended multiple murder cases and presented a third-party culpability defense in a few. While this was her first capital case, she had been trained in capital litigation.

The record reveals an extensive investigation by Hampton's trial counsel to follow up on the Wallace-as-murderer theory. In October 2001, Hampton told Logan that he should call Doerr. That same day, Doerr told Logan over the phone that she had information on Ross. On Logan's direction, the defense investigator contacted Doerr, who explained that Findley owed Geeslin (also present at the murders) a lot of money for drugs. The next month, Logan

spoke to Armijo by phone. Logan's handwritten notes from that conversation state that "Tim Wallace is The Guy." He then asked the investigator to follow up with Armijo because Wallace had told her "that he did the shooting." Logan also noted that Witness had information similar to Armijo's. "Contact her also," Logan said. In January 2002, the defense investigator wrote Logan to tell him that the interviews with Witness had fallen through. And in April, on the eve of trial, both Logan and the investigator made repeated attempts to get in contact with Armijo, Witness, and Doerr, none of whom responded.

At the evidentiary hearing 11 years later, Logan did not recall this investigation or why he chose not to call Armijo and Doerr as witnesses.[11] But courts cannot insist that "counsel confirm every aspect of the strategic basis for his or her actions." *Harrington*, 562 U.S. at 109. As Hampton concedes, Logan knew about the witnesses and the information they possessed, spoke to several of them on the phone and, as lead counsel, made the final call about which witnesses to present.

Hampton argues that Schaffer, by contrast, did not know about the witnesses because of her admitted failure "to investigate fully the third-party defense" and "communicate" with Logan. But Schaffer also admitted that she had full access to the case file, which included the defense investigator's memoranda and notes regarding the different witnesses. And while Schaffer testified that Logan failed to inform her of the witnesses, she equivocated on this point during an interview three years earlier, claiming that she did not recall. At any rate, Schaffer's statements at the

---

[11] Witness fled town after the murders and stated later that Hampton's counsel would not have been able to find her for trial.

evidentiary hearing—including that she lacked a tactical reason to not call the extra witnesses—do not move the ball on Hampton's IAC claim. "[A] handful of *post hoc* nondenials by one of [Hampton's] lawyers" is not enough to "rebut the presumption of competence mandated by *Strickland*." *Pinholster*, 563 U.S. at 194.

The record supports the PCR court's conclusion that strategic reasons existed to not call the witnesses. None of them had direct knowledge of what took place on the morning of the murders, several had close relationships with Hampton that could raise the specter of bias, and most admitted using drugs during the events to-be-testified-to, thus raising concerns about their perception and credibility. Logan testified that he would consider a witness's credibility and willingness to testify before calling him or her in support of a third-party defense. For Armijo in particular, Logan's interview notes reflected that he was concerned with possible impeachment, noting "1/2 way house. Has warrants." Armijo also admitted to being a drug user, and her allegations about Findley owing Wallace money were based not on personal knowledge but on "all sorts of stories going around before and after the murders."

There were similar concerns with Doerr. For example, Doerr told the defense investigator that she knew Findley owed "somebody" "quite a few thousand dollars" for drugs and that person was at the scene of the killings. But she refused to disclose the person's name while the tape recorder was on—even to save Hampton from prison—because it might put her in danger. She also complained of "a particular person" looking for her and shared that she was not staying at home for safety reasons. All this trepidation could have undermined Doerr's credibility and value as a witness. As Logan explained, though a witness need not be

willing to testify, "it certainly makes a big difference how they come across on the stand."

Further, while Hampton argues that Logan should have used the information he learned from Armijo to conduct a more thorough follow-up investigation, that investigation would not have been fruitful. Logan instructed the defense investigator to contact additional witnesses (Armijo, Witness, and Doerr) and follow up on evidence, but the investigator often failed because the witnesses were afraid. Witness had absconded after the murders. And Lopez, who hid first at a hotel, then at a house rented by Wallace, could not be located, even by the police.

As for the other evidence of prior bad acts, its relevance and admissibility was doubtful, as the PCR court explained. That Wallace had been arrested for possessing methamphetamine and that Geeslin was affiliated with the Aryan Brotherhood were attenuated to the question of who committed the murders. And Ross testified about her romantic relationship with Findley. The jury knew that Hampton was "instrumental" in getting Findley and Ramsdell back together, thus supporting Ross's motive to implicate Hampton as payback for disrupting her relationship with Findley. Lastly, evidence that Findley and Ramsdell had methamphetamine in their systems would not help the jury decide whether Hampton committed the murders. It would simply confirm what was already known: the murders took place in a house frequented by meth-users.

At bottom, we see no "clear error" in the PCR court's application of *Strickland*. *Kayer*, 592 U.S. at 118 (quotation omitted). The dissent, however, sees things differently. In its view, Hampton's trial counsel were so deficient that it was unreasonable for the PCR court to deny his guilt-phase

IAC claim. Dissent at 86–87. That conclusion cannot be squared with AEDPA's standard of review. For the dissent to be right, it must be true that there is not a single reasonable argument—not one—that Hampton's counsel performed adequately at the guilt phase. *Harrington*, 562 U.S. at 105 ("The question is whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." (emphasis added)). That is an exceedingly high bar, and rarely met. Mere disagreement with the PCR court is not enough to warrant AEDPA relief.

The PCR court's decision was far from unreasonable, let alone so off-base that not a single reasonable argument could be made in its favor. *See id.* ("[T]he range of reasonable applications is substantial."). The PCR court "affirmatively entertain[ed] the range of possible 'reasons [Hampton's] counsel *may* have had'" for not calling the extra witnesses or presenting other evidence to support the third-party culpability defense. *Pinholster*, 563 U.S. at 196 (emphasis added) (quotation omitted). In doing so, it appropriately applied *Strickland*'s "strong" presumption of "reasonable professional assistance"—a presumption that applies with force when evaluating decisions to call witnesses and present evidence. *Strickland*, 466 U.S. at 689; *see Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."). Because the record supplies ample strategic bases for not calling the extra witnesses or presenting the other evidence, the PCR court reasonably applied *Strickland* in concluding that Hampton's trial counsel were not ineffective at the guilt phase.

C

Finally, Hampton argues that the PCR court's conclusion that his counsel made a strategic decision not to present the extra witnesses and evidence was "an unreasonable determination of the facts" under § 2254(d)(2). We disagree.

To start, Hampton says the PCR court's factual findings were unreasonable because they were "infect[ed]" by the court's misapplication of *Pinholster*. *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004), *overruled on other grounds by Pinholster*, 563 U.S. at 185. But, as explained, the PCR court did not misapply *Pinholster* and its "affirmatively entertain[ing]" standard. *Supra*, at 46–48. That language addresses deference under *Strickland*, not AEDPA. *Id.*

Next, Hampton contends that the PCR court's findings were "unsupported by sufficient evidence." *Taylor*, 366 F.3d at 999. He notes that Logan could not remember anything from the case when testifying at the evidentiary hearing, and Schaffer said that she did not make a tactical decision to avoid the extra witnesses. This argument gets *Strickland* backwards. Courts "may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions" nor may they "insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington*, 562 U.S. at 109 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526 (2003)). There is a "strong presumption" that counsel's decision to not call the witnesses "reflects trial tactics rather than 'sheer neglect.'" *Id.* (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)). And it is Hampton's burden to overcome that "strong presumption." *Strickland*, 466 U.S. at 689–90. The PCR court identified the abundant problems

with the extra witnesses and their testimony—whether it was their lack of personal knowledge, potential bias, or drug use. Against that backdrop, Hampton has not overcome *Strickland*'s presumption of adequate assistance.

Relatedly, Hampton labels the PCR court's decision as unreasonable because it "ignored" the division of labor among the trial team. Schaffer, he notes, testified that she oversaw the third-party defense, yet Logan supposedly failed to tell her what he knew about Wallace's confessions. This argument is belied by the record. As lead counsel, Logan made the ultimate decision about who to call to the stand. Schaffer admitted that she had access to Logan's files, including the defense investigator's memoranda on the extra witnesses. And Schaffer later vacillated on whether Logan in fact failed to tell her about the witnesses. In light of this conflicting evidence, the PCR court did not "plainly misapprehend or misstate the record" in concluding that counsel performed adequately. *Taylor*, 366 F.3d at 1001.

Hampton next asserts that the PCR court glossed over the fact that the State's key witnesses—Ridley and Ross—also had credibility problems. That is no smoking gun. The State's witnesses may have had credibility problems, but Hampton's counsel still could have made a reasonable strategic decision to avoid calling witnesses whose credibility was also suspect.

Lastly, Hampton declares that there is "not a single piece of evidence" to support the PCR court's conclusion that his counsel considered the risks of calling the extra witnesses to the stand. But Logan's interview notes reveal information that could have been used to impeach Armijo, including her outstanding warrants and residence at a halfway house. And transcripts from the defense investigator's interview with

Doerr undermine her credibility by showing that she was unwilling to identify the alleged perpetrator of the crimes. There is sufficient record evidence to support the PCR court's conclusion.

In the end, § 2254(d)(2) "is a daunting standard" that "will be satisfied in relatively few cases." *Taylor*, 366 F.3d at 1000. This is not one.

\* \* \*

Applying AEDPA's deferential standard of review, we conclude that the PCR court reasonably determined that trial counsel's performance during the guilt phase was not constitutionally deficient under *Strickland*. Claim 3 is denied.

C

Moving to Claim 4, Hampton argues that his trial counsel were ineffective at the sentencing phase because they failed to investigate, develop, and present mitigation evidence that might have spared him the death penalty. This claim, as presented in Hampton's federal habeas petition, has two subclaims. Subclaim A contends that the jury heard only meager evidence of his family's alcoholism and mental health issues, as well as his childhood history of physical and sexual abuse by relatives and strangers. Hampton also maintains that his counsel were ineffective for failing to retain mental health and addiction experts, who could have contextualized his background and diagnosed him with several mental health conditions, including partial fetal alcohol syndrome and post-traumatic stress disorder.

In Subclaim B, Hampton challenges trial counsel's decision not to call other mental health experts who could establish that Hampton suffered from a mental disease or

defect at the time of the murders and a causal connection between Hampton's background and the murders. He asserts that had his counsel called these witnesses, there is a reasonable probability that the jurors would have voted for a sentence less than death.

Hampton raised Subclaim B during his state post-conviction proceedings. But he did not do the same for Subclaim A; that Subclaim is supported with evidence presented solely in federal court. Hampton argues that the new evidence presented to the federal court places his IAC claim in a "significantly different and stronger evidentiary posture," leaving the door open for de novo review under *Dickens*, 740 F.3d at 1318 (quotation omitted). This argument fails for reasons explained above. *See supra*, at 42–46. *Shinn* abrogated *Dickens*'s pathway to de novo review based on new evidence that fundamentally transforms an IAC claim not presented in state court. *McLaughlin*, 95 F.4th at 1250. Thus, we may consider only whether the PCR court properly rejected Hampton's original IAC claim—Subclaim B—based on the record presented to the PCR court.

1

As with Claim 3, the PCR court held an evidentiary hearing, during which it heard testimony from seven experts and Hampton's trial counsel. Dr. Richard Rosengard, a forensic psychiatrist, testified that he had been asked to evaluate Hampton in advance of trial. After meeting with Hampton and reviewing his records, Dr. Rosengard issued a pre-trial report diagnosing Hampton with several psychiatric conditions, including schizoaffective disorder with bi-polar features and traits of antisocial personality disorder (ASPD).

Trial counsel noticed their intent to call Dr. Rosengard as a witness during the sentencing phase. But they had second thoughts once the State revealed that it would present rebuttal from Dr. Michael Bayless, who would have a chance to interview Hampton before his testimony. At the evidentiary hearing, Logan explained that Dr. Bayless had a "horrible" reputation for defendants and presented well on the stand. Logan and Schaffer weighed the benefits of calling Dr. Rosengard against having Hampton examined by Dr. Bayless, ultimately deciding that precluding Dr. Bayless's testimony was more important. The defense team also decided not to call Dr. Rosengard because some of his mental health testimony (e.g., the references to ASPD) seemed more damaging than helpful.

To support his argument that additional experts should have been retained and presented at the sentencing phase, Hampton called Dr. Karen Froming and Dr. Joseph Wu to testify at the evidentiary hearing about his mental health issues. Dr. Froming, a neuropsychologist, evaluated Hampton in May 2010, nine years after the murders. She concluded that Hampton suffered from frontal lobe impairment in the area regulating emotion and behavior. She also opined that Hampton's diagnosis contributed to his criminal conduct; because the traumatic events in his life occurred before the murders, they were "strong contributors to that legal involvement." Dr. Wu offered similar analysis. According to his own scans of Hampton's brain, Hampton had a frontal lobe abnormality that "results in impaired ability to control aggression," particularly because he grew up in an abusive, stressful environment.

Hampton also called an experienced death penalty litigator to testify as a *Strickland* expert, who opined that the standard of care demands presenting "mental health experts

at the sentencing or mitigation phase." He testified that expert testimony—based on the American Bar Association (ABA) guidelines—is required in every capital case. He also disagreed that there can be strategic reasons for not calling an expert. But on cross-examination, the expert backtracked and agreed that if a defense attorney believes that his own expert's testimony could hurt his client, that could be a reason to not call a mental health expert.

The State offered its own experts. Dr. Steven Pitt, another forensic psychiatrist, disagreed with Dr. Rosengard's assessment that Hampton suffered from schizoaffective disorder. In Dr. Pitt's view, Hampton did not suffer from a mental impairment that prevented him from appreciating the wrongfulness of his conduct. And in his opinion, the evidence showed that Hampton was not acting impulsively at the time of the murders but acted to evade apprehension and destroy evidence. Similarly, Dr. Kiran Amin, after interviewing Hampton and administering neuropsychological tests, concluded that Hampton was not cognitively impaired. Both experts disagreed with Hampton's experts that there was a causal connection between Hampton's mental conditions and the murders.

The PCR court denied Hampton's sentencing-phase IAC claim in a reasoned opinion. It first cataloged the extensive mitigation evidence that was presented to the jury, totaling "nearly 1000 pages of background materials." Most mitigation evidence detailed Hampton's personal and family history—his mother was an alcoholic, his biological father and stepfathers abused him, and his older brothers were drug addicts who were incarcerated during Hampton's early years. Hampton had his own struggles with drugs. He first tried methamphetamine when he was 13 and became addicted. Given the allegations that the murders were

motivated in part by race, several individuals testified that their relationships with Hampton were not affected by their race, even though each witness belonged to a minority group. An ex-girlfriend testified that Hampton "was a really sweet guy," and a daughter of another ex-girlfriend testified that Hampton acted as a "loving father," even though he was not her biological father.

The PCR court next concluded that trial counsel's strategy at the sentencing phase was reasonable. Both Logan and Schaffer tried to minimize the jury's exposure to damaging testimony, like any expert opinion from Dr. Bayless or references to ASPD. Trial counsel's choice not to present certain expert testimony was a reasonable tactical decision, given that doing so would allow Hampton to be cross-examined by the State's experts and would introduce damaging mental health evidence. The ASC denied review.

2

Again, we apply AEDPA's "doubly deferential" standard of review to the PCR court's denial of Hampton's sentencing-phase IAC claim. *Knowles*, 556 U.S. at 123. And again, we look to *Strickland*. We conclude that the PCR court reasonably determined that Hampton's trial counsel did not offer constitutionally deficient representation during the sentencing phase.

a

Hampton presses two arguments for why the PCR court's denial of his sentencing-phase IAC claim was "contrary to" clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). First, as he did for his guilt-phase IAC claim, Hampton contends that the PCR court applied double

deference by quoting *Pinholster*'s "affirmatively entertain the range of possible reasons" language, and that this was contrary to *Strickland*. *See Pinholster*, 563 U.S. at 196 (internal quotation marks omitted). Again, this argument lacks merit. *See supra*, at 46–48.

Second, Hampton argues that the PCR court applied a local, rather than national, standard of practice in evaluating the reasonableness of his counsel's conduct. He points to the following statement from the PCR court's decision: "The Court finds that the standard of practice in Maricopa County in 2002–2003 for the mitigation phase of capital cases was in a state of flux, the system having been forced by constitutional mandates to abandon judge-sentencing in favor of jury-sentencing." Hampton maintains that this was contrary to *Strickland* because attorneys are held to the standard of prevailing professional norms across the country—not the norms in their individual state.

The PCR court did not err in referencing the standard of practice in Maricopa County at the time of Hampton's trial. Nothing in its decision suggests that it swapped the County standard for the proper standard: "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. In considering the testimony of Hampton's *Strickland* expert, the court reiterated that reliance on the ABA guidelines is not enough—the "proper standard for attorney performance is that of reasonably effective assistance."

Having articulated the proper standard, the PCR court then made a contextual, factually accurate reference to the standard of practice in Maricopa County. It was not wrong to do so. In *Wiggins*, the Supreme Court held that "'reasonableness under prevailing professional norms' . . . includes a context-dependent consideration of

the challenged conduct as seen 'from counsel's perspective at the time.'" 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688–89). The Court then evaluated counsel's performance under "the professional standards that prevailed in Maryland" at the time, as well as the ABA guidelines. *Id.* at 524. The PCR court's reference to prevailing practices in Arizona was consistent with *Wiggins*. We therefore reject Hampton's arguments under § 2254(d)(1)'s "contrary to" prong.

b

Hampton next argues that it was an "unreasonable application" of *Strickland* to conclude that his trial counsel's decision not to call Dr. Rosengard was a reasonable tactical choice. *See* 28 U.S.C. § 2254(d)(1). But Hampton has not shown that the PCR court's contrary conclusion was unreasonable.

First, Hampton's counsel undertook an extensive investigation into his background. The defense team obtained mitigation evidence spanning much of Hampton's life—including his foster care placement records; records of his arrests, convictions, and incarcerations; and extensive medical and psychiatric history. The defense team also included a mitigation specialist who traveled across the country to interview Hampton's family members. Dr. Rosengard reviewed much of this background material, noting that his own clinical interview with Hampton was "far less important than the review of the records."

The background investigation did reveal a problem, however. The medical records confirmed that Hampton had four previous diagnoses for ASPD, which could harm Hampton's mitigation case. *See, e.g.*, *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (evidence of

antisocial behavior can be "extremely harmful" to a
defendant's mitigation case).     Given this history,
Dr. Rosengard's report noted that Hampton had "traits" of
ASPD.  And although Dr. Rosengard later clarified that he
did not diagnose Hampton with ASPD, he wanted his report
to reflect the "truth of the matter" that some of Hampton's
behaviors could be considered antisocial: "He was locked
[up] numerous times.  How foolish would it be to not
acknowledge these things?"    Like  Dr. Rosengard,
Dr. Froming and Dr. Wu—both of whom testified on
Hampton's behalf at the evidentiary hearing—believed that
Hampton exhibited antisocial tendencies, even if he did not
satisfy the criteria for a formal ASPD diagnosis.

Trial counsel ultimately decided against calling
Dr. Rosengard during the sentencing phase—both because
his testimony would have opened the door to more evidence
of Hampton's ASPD, and because it would have given
Dr. Bayless  an  opportunity  to  effectively  rebut
Dr. Rosengard's opinion.  As the PCR court noted, the same
concerns motivated trial counsel's decision not to call
additional mental health experts.  To present such testimony,
Hampton would have had to be examined by the State's
experts, thus raising the chances of even more damaging
mental health evidence.

Granted, trial counsel had a different view of the case at
the evidentiary hearing 11 years later.  Schaffer testified that
she should have presented a mental health expert, and Logan
noted that "[b]ased on today's practice, [the investigation]
probably would have been more exhaustive and there would
have been more done."    But that does not mean the
investigation and presentation were unreasonable at the time
of Hampton's trial.  *See Harrington*, 562 U.S. at 109 ("After
an adverse verdict at trial even the most experienced counsel

may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome."). Hampton must overcome the "strong presumption" that his counsel's decision not to investigate further and not to call Dr. Rosengard was "sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation omitted). And based on the legitimate concerns with presenting evidence of Hampton's ASPD, combined with opening the door to adverse expert testimony, Hampton has not overcome that presumption. *See Bejarano v. Reubart*, 136 F.4th 873, 891 (9th Cir. 2025) ("We have repeatedly noted the potential pitfalls of presenting a jury with evidence that a defendant suffers from A[S]PD . . . ."). Thus, it was not an unreasonable application of *Strickland* for the PCR court to conclude that Hampton's counsel performed adequately during the sentencing phase.

c

Lastly, Hampton contends that the PCR court made several unreasonable determinations of the facts in rejecting his sentencing-phase IAC claim. *See* 28 U.S.C. § 2254(d)(2). First, Hampton points to two statements from the PCR court's decision: that "the defense team . . . ultimately decided against calling Dr. Rosengard," and that "Schaffer agreed with [] Logan's decision." Hampton claims that Schaffer (not Logan) made the decision to pass on Dr. Rosengard, and it was not strategic because Schaffer admitted that she did not know what she was doing. The record, however, supports the PCR court's factual finding that it was a joint decision to forgo Dr. Rosengard's testimony. At the evidentiary hearing, both Schaffer and Logan testified that they consulted each other, discussed the pros and cons of calling Dr. Rosengard, and settled on their

strategy. Schaffer explained that she was "primarily" responsible for the decision to not call Dr. Rosengard; in doing so, she "consulted with Mr. Logan." Logan recalled that he discussed "the utilities" of calling Dr. Rosengard with Schaffer and the mitigation specialist while "[p]rimarily" relying on Schaffer for a recommendation. And while Schaffer also claimed that she did not know what she was doing, those statements differ from the testimony showing that the defense team made a concerted effort to weigh the risks of calling Dr. Rosengard. The PCR court's factual finding is consistent with that testimony.

Second, Hampton targets the PCR court's conclusion that trial counsel's decision "not to seek additional neuropsychological experts was also reasonable and a matter of trial tactics and strategy." He says this statement was belied by the factual record in part because Schaffer testified that she did not recognize the importance of a neuropsychological examination at the time. However, Logan testified that Hampton's case was one of the first capital cases in Maricopa County with jury sentencing, and there was not yet a standard practice for consulting a neuropsychologist. "We were feeling them out at the time," he said. That rebuts Schaffer's suggestion that her failure to call a neuropsychologist was negligent, rather than a tactical decision. And, again, Hampton's counsel were concerned with his four previous ASPD diagnoses, which any neuropsychological expert would have had to address. Thus, it was not an unreasonable interpretation of the facts to say that the decision not to seek additional neuropsychological testimony was a reasonable trial strategy.

Third, Hampton charges that the PCR court overlooked several pieces of evidence that were favorable to his case. Examples include Dr. Froming's diagnoses; points from

Dr. Pitt's testimony that, in Hampton's view, bolstered his claims; and the testimony of Dr. Mark Cunningham, a forensic psychologist whose deposition was admitted at the evidentiary hearing. Most of Hampton's allegations are out of step with the record. The PCR court expressly discussed Dr. Froming's diagnoses. And it devoted a paragraph to Dr. Cunningham's testimony. As for the remaining evidence allegedly ignored, we do not see any error in the PCR court's decision. "[S]tate courts are not required to address every jot and tittle of proof suggested to them, nor need they make detailed findings addressing all the evidence before them." *Taylor*, 366 F.3d at 1001 (cleaned up). Rather, to infect the fact-finding process, the "overlooked or ignored evidence must be highly probative and central to petitioner's claim." *Id.* Hampton makes no attempt to explain how that standard is met here. *See, e.g.*, *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009) (reasoning that arguments not raised "clearly and distinctly" in the opening brief are forfeited). We thus reject Hampton's arguments under § 2254(d)(2).

\* \* \*

Claim 4 lacks merit. Viewed through AEDPA's deferential lens, the PCR court reasonably determined that Hampton's counsel were not constitutionally deficient during the sentencing phase. *See Strickland*, 466 U.S. at 687–88.

## D

Hampton's fourth and final certified claim asks whether the district court abused its discretion in denying an evidentiary hearing on Claims 2 through 4. *See Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). AEDPA generally "bars evidentiary hearings in federal habeas

proceedings initiated by state prisoners." *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013). Under § 2254(e)(2), a federal habeas court may not consider new evidence or hold an evidentiary hearing where a petitioner failed to develop the record in state court, unless he satisfies one of two narrow exceptions, § 2254(e)(2)(A), and demonstrates "by clear and convincing evidence" that the new evidence will prove his innocence, § 2254(e)(2)(B). One fails to develop the state-court record where "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Michael Williams*, 529 U.S. at 432. Section 2254(e)(2) accordingly "imposes a limitation on the discretion of federal habeas courts to take new evidence in an evidentiary hearing." *Pinholster*, 563 U.S. at 185. And it "restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Id.* at 186.

Starting with the Ridley-related claims, Hampton has not shown diligence in his initial factual development in state court. Trial counsel knew Ridley's PSI was being prepared and had essential facts about the information it would contain. Yet they did not interview Ridley's ex-wife or otherwise discover the information in the PSI, as the defense investigator recommended. As Hampton concedes, the PSI was available to trial counsel for the sentencing phase. And while Hampton's state post-conviction counsel had the PSI report in his file, he still failed to present the Ridley claims in state court. Under *Shinn*, state post-conviction counsel's negligence in failing to develop the state-court record is attributed to Hampton for purposes of § 2254(e)(2). 596 U.S. at 382. Finally, Hampton cannot satisfy the statute's exceptions. *See* 28 U.S.C. § 2254(e)(2)(A). His claim does not rest on a new rule of constitutional law, and because his

state post-conviction counsel possessed the PSI, he cannot demonstrate that the claim's factual predicate could not have been previously discovered through the exercise of due diligence. *See id.* The district court did not abuse its discretion in denying an evidentiary hearing on Claim 2.

Nor can Hampton show entitlement to an evidentiary hearing on his two IAC claims. The district court reviewed both claims under AEDPA because they were adjudicated on the merits in state court. Review under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. And review under § 2254(d)(2) is limited by its terms to "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Because Hampton cannot demonstrate that the PCR court's denial of Claims 3 or 4 violated AEDPA, the district court acted within its discretion in denying an evidentiary hearing on those claims. *See Pinholster*, 563 U.S. at 183; *see also Shinn*, 596 U.S. at 371, 375–76.

Having failed to meet § 2254(e)(2)'s "stringent requirements," *Shinn*, 596 U.S. at 384, Hampton is not entitled to relief on Claims 3 and 4.

IV

We turn next to Hampton's seven uncertified claims. To obtain a COA, Hampton must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). He satisfies that standard if reasonable jurists "could disagree with the district court's resolution of his constitutional claims" or if jurists could conclude that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.

At the COA stage, we are limited "to a threshold inquiry into the underlying merit of [Hampton's] claims," asking "only if the District Court's decision was debatable." *Buck v. Davis*, 580 U.S. 100, 116 (2017) (quoting *Miller-El*, 537 U.S. at 327, 348). This is "not coextensive with a merits analysis." *Id.* at 115. We make decisions on COAs without "full consideration of the factual or legal bases" for the claims; otherwise, we would be essentially "deciding an appeal without jurisdiction." *Id.* (quoting *Miller-El*, 537 U.S. at 336–37). We decline to expand the COA to cover Hampton's uncertified claims.

A

First are three claims that Hampton raised in his initial request for a COA. Although a motions panel denied a COA on these claims, that does not prevent Hampton from raising them before us. *See Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). We will treat Hampton's discussion of these claims in his opening brief as a request to expand the COA. *See Catlin*, 124 F.4th at 721; 9th Cir. R. 22-1(e).

1

In Claim 6, Hampton alleged that the State committed prosecutorial misconduct during its sentencing-phase closing argument.[12] Hampton objects to the prosecutor labeling him a "monster," a "harbinger of death," and an "urban terrorist," which he says was especially problematic because the sentencing phase took place shortly after the 9/11 attacks. He also maintains that the prosecutor

---

[12] Hampton also alleged that his trial counsel were ineffective in failing to object to the alleged misconduct. But Hampton does not request a COA on the IAC portion of Claim 6 and does not offer any argument on appeal. So we do not consider it.

improperly aligned the jury with the State by using the words
"we," "us," and "our" in referring to the effects of
Hampton's criminal acts. And he argues that the State
invoked imagery of war and misstated the law on mitigation.

The district court denied Claim 6 on the merits, even
though Hampton did not raise it in state court. *Hampton*,
2019 WL 979896, at *16–17. The district court's merits
decision is not debatable among jurists of reason. *See
Miller-El*, 537 U.S. at 327. A prosecutor's comments during
closing argument do not violate the Constitution unless they
"so infected the trial with unfairness as to make the resulting
conviction a denial of due process." *Donnelly v.
DeChristoforo*, 416 U.S. 637, 643 (1974). Improper
prosecutorial argument generally should not result in
reversal where the trial court instructed the jury that closing
arguments are not evidence. *See Darden v. Wainwright*, 477
U.S. 168, 182 (1986); *see also Boyde v. California*, 494 U.S.
370, 384 (1990) ("[A]rguments of counsel generally carry
less weight with a jury than do instructions from the court.").

As the district court explained, the jury was instructed
that what the lawyers said in closing argument "is not
evidence" and that they were to follow the statements of law
provided in writing. *Hampton*, 2019 WL 979896, at *17.
The district court noted that the prosecutor's comments are
not egregious enough to render Hampton's sentencing
fundamentally unfair.[13]   *See, e.g.*, *Darden*, 477 U.S. at 180

_____

[13] Hampton argues that the alleged misconduct during closing should be
cumulated with the alleged *Brady* and *Napue* violations relating to
Ridley's PSI. But he did not make this argument in the district court or
develop it on appeal; nor does he request a COA on the cumulative error
claim. The argument is therefore forfeited. *See Tibble v. Edison Int'l*,
843 F.3d 1187, 1193 (9th Cir. 2016) (en banc).

(concluding that reference to defendant as an "animal" was improper but not a due process violation). Given the presumption that juries follow the court's directions, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987), combined with the nature of the prosecutor's statements, no reasonable jurist would dispute the district court's resolution of Claim 6. We decline to expand the COA.

2

Claim 17 contends that Hampton's constitutional rights were violated by the death qualification of his guilt-phase jury. Death qualification refers to the process by which "prospective jurors [are] excluded for cause in light of their inability to set aside their views about the death penalty." *Buchanan v. Kentucky*, 483 U.S. 402, 407 n.6 (1987). Before trial, the trial court denied a defense motion to preclude the death qualification of Hampton's guilt-phase jury, leading to the exclusion of three prospective jurors. The trial court death qualified the jury even though—at the time of Hampton's trial—the death penalty could be imposed in Arizona by the sentencing judge alone. *See* Ariz. Rev. Stat. Ann. § 13-703(C) (2001). Arizona's capital sentencing scheme was invalidated in *Ring I*, decided a month after Hampton's guilt-phase verdict. 536 U.S. at 609. That is why a new jury sentenced Hampton to death. *See supra*, at 9.

The ASC denied Hampton's death-qualification claim on direct appeal. *Hampton*, 140 P.3d at 955–56. The United States Supreme Court, the ASC explained, "has long held that the death qualification of juries is constitutional." *Id.* (citing *Wainwright v. Witt*, 469 U.S. 412, 424–25 (1985)). With that background, the ASC saw no error in the death qualification of Hampton's guilt-phase jury—a jury that had

no role in his eventual sentencing. *Id.* at 956 (citing *State v. Anderson*, 111 P.3d 369, 379 (Ariz. 2005)). The district court concluded that the ASC's decision was not an unreasonable application of or contrary to clearly established federal law.

No reasonable jurist would debate that conclusion. *See Miller-El*, 537 U.S. at 327. So-called "nullifiers," or individuals who, because of their beliefs, inevitably vote against the death penalty, "may properly be excluded from the guilt-phase jury." *Lockhart v. McCree*, 476 U.S. 162, 172 (1986). And death qualification is permissible even if guilt-phase jurors are told they will not be responsible for determining punishment. *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996). We therefore decline to expand the COA.

3

Hampton also argues that the district court abused its discretion in denying his motion for a *Rhines* stay and abeyance. *See Blake v. Baker*, 745 F.3d 977, 980 (9th Cir. 2014). In *Rhines*, the Supreme Court articulated a procedure to allow federal habeas petitioners to return to state court to exhaust claims that were not previously adjudicated in state court. 544 U.S. at 271–72. After receiving a state-court decision, a petitioner can then return to federal court for review of his fully exhausted § 2254 petition. *Id.* A *Rhines* stay is appropriate only where the petitioner has shown (1) "good cause" for his failure to exhaust; (2) the unexhausted claim is "potentially meritorious"; and (3) he did not "engage[] in intentionally dilatory litigation tactics." *Id.* at 278. Even if a petitioner has good cause for his failure to exhaust, "the district court would abuse its discretion if it

were to grant him a stay when his unexhausted claims are plainly meritless." *Id.* at 277.

Before the district court, Hampton moved for a *Rhines* stay with respect to two claims first raised in his federal habeas petition. The first (Claim 1) alleged that Hampton is actually innocent. We denied a COA on Hampton's substantive actual innocence claim, and he does not raise it as an uncertified claim in his opening brief. So we do not consider it. The second is Claim 2, which encompasses the *Brady*, *Napue*, and IAC claims relating to Ridley's PSI. The district court denied Hampton's stay-and-abeyance motion, concluding that Arizona's procedural-default rule would bar Claim 2 from adjudication in state court, and that no exception to that rule applied.

Because we reject Claim 2 on the merits, *see supra*, at 18, the issue of whether the district court abused its discretion in denying a *Rhines* stay is moot. *Id.* at 278 (stay and abeyance is available for a "potentially meritorious" claim). Even if Hampton were allowed to exhaust Claim 2, and even if he could overcome any procedural default for not having raised that claim in earlier state-court proceedings, he would not find himself in a better procedural posture than what he has been afforded here. The most Hampton could hope for, even with a *Rhines* stay, is de novo, non-deferential review of his *Brady*, *Napue*, and related IAC claims. Having denied these claims on the merits without any form of deference, we need not decide whether the district court's denial of a *Rhines* stay was debatable. *See Slack*, 529 U.S. at 484–85.

## B

We turn now to four claims not raised in Hampton's initial request for a COA, but as part of his merits appeal.

We can consider these claims under § 2253(c), *Hiivala*, 195 F.3d at 1104, and again treat them as a request to expand the COA, *Catlin*, 124 F.4th at 721.

1

First is Claim 28. Hampton argues that his direct-appeal counsel was constitutionally ineffective for, among other things, failing to challenge the admission of evidence at sentencing that Hampton was affiliated with the Aryan Brotherhood. He contends that the Aryan Brotherhood evidence was not only exceptionally prejudicial; its introduction also purportedly violated his First Amendment associational rights. *See Dawson v. Delaware*, 503 U.S. 159, 167 (1992).

Hampton presented this claim to the PCR court, which denied the claim without an evidentiary hearing. Hampton then failed to raise the issue in his petition for review to the ASC. The district court therefore concluded that the claim was procedurally defaulted, and that *Martinez*—because it does not apply to IAC of appellate counsel claims—does not excuse the default. *Davila*, 582 U.S. at 529–30; *Hampton*, 2019 WL 979896, at *31. No reasonable jurist would disagree with that conclusion. *Slack*, 529 U.S. at 484.

Putting aside the district court's procedural analysis, for a COA to issue, reasonable jurists must still find it debatable that Hampton has stated a "valid claim of the denial of a constitutional right." *Id.* Hampton has not met that bar. Here, some background is helpful. Prior to trial, the court barred any references to the Aryan Brotherhood. Yet during Ridley's direct testimony, he began to volunteer that Hampton told him that certain promises had been made to Hampton by the Aryan Brotherhood. Hampton promptly moved for a mistrial, which the trial court at first denied.

The trial court later changed its mind and granted the motion after a juror asked a question about whether Hampton had any Aryan Brotherhood tattoos.

Then, out of left field, Hampton's counsel advised the trial court that Hampton wished to withdraw the mistrial motion because he was "comfortable with this jury" and "comfortable with this trial." After expressing how stunned she was by the change of events, the trial judge confirmed that Hampton understood the ramifications of withdrawing the mistrial motion. Hampton understood that he was waiving the issue on appeal as a basis for overturning his conviction. And he was also "fully aware" that the State was seeking the death penalty and that withdrawing the motion could impact the resolution of the penalty phase. Based on those assurances, the trial court vacated the order granting a mistrial.

During the aggravation phase, the trial judge, over Hampton's objection, allowed Ridley's Aryan Brotherhood testimony on two grounds. First, because Hampton's objection to the testimony had previously been withdrawn. And second, because the evidence was relevant to proving the heinous-or-depraved aggravator—the State had to show that Hampton "relished" Ramsdell's murder. *See* Ariz. Rev. Stat. Ann. § 13-703(F)(6) (2001). Hampton now argues that his direct-appeal counsel was ineffective for failing to challenge the admission of Ridley's testimony during the aggravation phase.

Hampton has not, however, made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To establish ineffective assistance of appellate counsel, Hampton must satisfy the *Strickland* standard. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). Appellate

counsel's performance is not deficient for failing to raise meritless claims. *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012). Here, reasonable jurists could not debate that any appellate argument targeting the trial court's admission of Ridley's Aryan Brotherhood testimony at the aggravation phase would have been meritless. First because the testimony was relevant to proving the heinous-or-depraved aggravator.[14]    *See Dawson*, 503 U.S. at 165 (defendants' First Amendment rights yield when evidence of their association with a particular group is relevant to an issue at trial). And second because Hampton affirmatively waived any objection to the Aryan Brotherhood testimony for purposes of appeal. *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (appellate counsel "frequently remain above an objective standard of competence" when they "decline[] to raise a weak issue"). Hampton has failed to make the necessary showing for us to expand the COA.

2

Next, Hampton argues in Claim 13 that applying Arizona's amended death penalty statutes to his case after *Ring I* violated the Constitution's prohibition on ex post facto laws. The Ex Post Facto Clause provides that "No State shall . . . pass any . . . ex post facto Law." U.S. Const. art. 1, § 10, cl. 1.[15]    It forbids a state from retroactively

---

[14] Although the ASC later struck the heinous-or-depraved aggravator for faulty jury instructions, the evidence was still relevant when the trial court made its ruling. *See Hampton*, 140 P.3d at 960; *see also supra*, at 10 n.3.

[15] This provision applies only to state legislation. The Constitution includes another clause that prohibits the enactment of ex post facto laws by the federal government. *See* U.S. Const. art. I, § 9, cl. 3. By citing

changing the definition of a crime to make what was innocent conduct illegal. *See Collins v. Youngblood*, 497 U.S. 37, 42–43 (1990). Nor may a state increase the punishment for a crime after the fact. *Id.* But the Ex Post Facto Clause does not apply to merely procedural laws. *Dobbert v. Florida*, 432 U.S. 282, 293 (1977). Procedural changes "simply alter[] the methods employed in determining whether the death penalty [may] be imposed" but do not affect "the quantum of punishment attached to the crime." *Id.* at 293–94. It does not matter that the procedural change may disadvantage the defendant. *Id.* at 293.

After the United States Supreme Court invalidated Arizona's capital sentencing scheme in *Ring I*, the state legislature passed a new capital statute to comply. *See Hampton*, 140 P.3d at 957. Later, in *State v. Ring* (*Ring II*), the ASC held that the new statute did not violate the Ex Post Facto Clause because the changes in how the death penalty was imposed were procedural; they did not expose Arizona's capital defendants to greater punishment. 65 P.3d 915, 926–28 (Ariz. 2003). The ASC rejected Hampton's ex post facto claim for the same reasons as *Ring II*. *Hampton*, 140 P.3d at 957 (citing *Ring II*, 65 P.3d at 928).

Analyzing *Ring II*, the district court concluded that the ASC's decision was neither contrary to nor an unreasonable application of clearly established federal law. *Hampton*, 2019 WL 979896, at *22. Reasonable jurists would agree with the district court's analysis, particularly under our

_____

cases interpreting the federal Ex Post Facto Clause in cases involving the state clause, and vice versa, the Supreme Court has suggested that the two clauses have equal scope. *See, e.g.*, *Peugh v. United States*, 569 U.S. 530, 539 (2013) (citing *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 509 (1995)).

decision in *McGill v. Shinn*, 16 F.4th 666 (9th Cir. 2021). In *McGill*, we addressed a nearly identical argument that Arizona's law curing the *Ring I* defect violates the Ex Post Facto Clause. 16 F.4th at 699–704. And there too the ASC had relied on *Ring II* in rejecting the prisoner's claim. *Id.* at 703. Interpreting *Ring II*, we held that "the Arizona Supreme Court reasonably concluded in light of [United States Supreme Court precedent] that the amendments to [Arizona's death penalty statute] are plainly procedural, not substantive." *Id.*; *see also Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) ("[*Ring I*'s] holding is properly classified as procedural."). Thus, we concluded that the Arizona prisoner was not entitled to AEDPA relief based on a claimed violation of the Ex Post Facto Clause. 16 F.4th at 706. Given *McGill*, no reasonable jurist would debate the district court's rejection of Claim 13.

3

Claim 27 contends that the ASC, after invalidating the heinous-or-depraved aggravator, improperly discounted mitigating evidence in its independent review of Hampton's death sentences. Hampton maintains that the ASC assigned "de minimis weight" to his mitigating evidence because he failed to establish a causal connection between the evidence and the crimes. This allegedly violated *Tennard v. Dretke*, which holds that the sentencer must be able to consider all relevant mitigating factors during the penalty phase of a capital case. 542 U.S. 274, 285 (2004). Lastly, Hampton argues that his direct-appeal counsel was ineffective for failing to raise his *Tennard* claim in a motion for reconsideration before the ASC.

Hampton raised this claim for the first time in state post-conviction proceedings. The PCR court concluded that,

because the claim was not raised in a motion for reconsideration to the ASC on direct appeal, it was waived. The district court considered this an independent and adequate state ground that rendered Claim 27 procedurally defaulted. *Hampton*, 2019 WL 979896, at \*30–31.

Hampton argues that Claim 27 is not procedurally defaulted because the PCR court denied it on the merits as well. Under *Harris v. Reed*, the procedural default doctrine does not bar consideration of a federal claim on habeas review if there is some ambiguity as to whether the state court's judgment rested on a state procedural bar. 489 U.S. 255, 263 (1989); *see also Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).

We need not decide whether *Harris* applies. Even if Hampton is right, he still has not shown that reasonable jurists could differ on whether he has stated a valid claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85. The ASC did not, as Hampton suggests, categorically refuse to give full effect to Hampton's mitigation evidence. The court noted that the "majority of the mitigation evidence detailed Hampton's very difficult personal and family history." *Hampton*, 140 P.3d at 967. It considered this evidence "not insubstantial" and underscored that Hampton "had a horrendous childhood." *Id.* at 968. But the court concluded that this evidence was "entitled to less weight" because it was not tied to Hampton's "murderous behavior," and decades had passed between Hampton's childhood and his crimes. *Id.*

*Tennard* does not prohibit that conclusion. Sentencers are free to assign less weight to relevant mitigation evidence because it lacks a causal connection to a crime. *Thornell v. Jones*, 602 U.S. 154, 164–65 (2024); *see Eddings v.*

*Oklahoma*, 455 U.S. 104, 114–15 (1982) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence."). They just cannot refuse to consider that evidence altogether. *Thornell*, 602 U.S. at 164–65. The ASC did not ignore Hampton's mitigation evidence; it found it unpersuasive. That comports with *Tennard* and our precedent. *See McKinney*, 813 F.3d at 818 (the failure to establish a "causal connection" between the mitigation evidence and the crime "may be considered in assessing the quality and strength of the mitigation evidence" (quoting *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006))).

No reasonable jurist would therefore conclude that Hampton's *Tennard* claim deserves encouragement to proceed any further. *See Miller-El*, 537 U.S. at 327. And for the same reasons, Hampton does not make a substantial showing that his direct-appeal counsel was ineffective for failing to raise a dubious claim. *See Sexton*, 679 F.3d at 1157. Hampton's request to expand the COA is denied.

4

Finally, in Claim 33, Hampton alleges that his death sentences are unconstitutional because Arizona's capital sentencing scheme did not afford him the procedural safeguard of proportionality review. Under this system, courts review each death sentence to confirm that it is proportionate to sentences imposed for similar crimes. *Gregg v. Georgia*, 428 U.S. 153, 204 (1976) (joint op. of Stewart, Powell & Stevens, JJ.). Since 1992, Arizona has declined to conduct proportionality reviews in death penalty cases. *State v. Salazar*, 844 P.2d 566, 584 (Ariz. 1992). Hampton contends that Arizona's scheme violates the Fifth, Eighth, and Fourteenth Amendments.

The district court rejected Claim 33 as foreclosed by Supreme Court and circuit precedent. *Hampton*, 2019 WL 979896, at \*33. No reasonable jurist would disagree. In *McCleskey v. Kemp*, the Supreme Court reiterated that "proportionality review is not constitutionally required" where "the statutory procedures adequately channel the sentencer's discretion." 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984)). Twelve years later, in *Ceja*, we held that Arizona's "application of an adequately narrowed aggravating circumstance" ensures that a defendant's "substantive right to be free from a disproportionate sentence" is not violated. 97 F.3d at 1252; *see id.* ("There is no federal right to proportionality review . . . ."). We will not expand the COA to encompass this claim.

V

We affirm the district court's denial of Hampton's federal habeas petition. And we decline to expand the COA for any uncertified claims. Hampton's pending motion for reconsideration is denied as moot.

**AFFIRMED**

FRIEDLAND, Circuit Judge, dissenting:

I would grant this petition. Hampton's defense attorneys were constitutionally defective at the guilt phase of his trial because they failed to present testimony from two witnesses that another person committed the murders at issue and testimony from a third witness that cast doubt on the credibility of the State's star witness. There is no reasonable justification for counsel's failure to call those additional witnesses, particularly given the remarkably weak evidence that supported Hampton's conviction. Even under the highly deferential standard of review that applies to ineffective assistance of counsel claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), I think Hampton has a valid habeas claim. Indeed, having carefully studied the record, I have serious doubt that Hampton committed the murders for which he was convicted and sentenced to death.

## I.

### A.

The State's case against Hampton was based almost entirely on the testimony of two witnesses. Misty Ross testified at trial that she saw Hampton shoot Findley and heard Hampton shoot Ramsdell. George Ridley, Hampton's cellmate during his pre-trial detention, testified that Hampton confessed to the murders while in jail. The State did not present any physical evidence linking Hampton to the killings. At closing argument in Hampton's guilt-phase trial, the State emphasized that those two witnesses provided the critical evidence in the case, stating that "[t]his is an eyewitness case" and that if the jury chose not to accept the

testimony of Ross or Ridley, then "let's be frank, the State doesn't have a case."

Misty Ross provided the only account of the events on the day of the murders. As the majority recounts in greater detail, Ross testified that on May 17, 2001, she was at the house where Hampton had been living with Findley and Ramsdell and that she spent most of the morning getting high on methamphetamines. According to Ross, Hampton and Shaun Geeslin (with whom Ross was in an intimate relationship at the time) left the house for a short time and then returned around noon and entered a back room where Ross and Findley were talking.[1] Ross testified that she saw Hampton shoot Findley in the forehead. Ross testified that she then started to leave the house with Geeslin and that Hampton began to follow them but stopped and said, "Wait, we have one more." Ross then heard Hampton force open the door of the bedroom where Ramsdell was sleeping and shoot Ramsdell. Ross testified that Hampton then left the house with her and Geeslin and that the three of them remained together until they parted ways late that night. According to Ross, Hampton asked as they left the house if he had any blood on his face and later that day commented: "What, I killed two people."

George Ridley, Hampton's cellmate, testified that Hampton confessed to the murders every night for two weeks. According to Ridley, after Hampton killed Ramsdell, he returned to Findley's body and whispered in Findley's ear, "I just want to let you know I took care of your

---

[1] Geeslin asserted his Fifth Amendment right against self-incrimination and did not testify at trial.

nigger loving old lady and her little coon baby, too. But don't worry. They didn't feel a thing."

As the majority notes and as the State acknowledged in its briefing to our court, Ridley was "thoroughly impeached" at trial. Maj. Op. at 23. Among other impeachment evidence, the defense emphasized Ridley's motive to testify against Hampton in exchange for receiving a plea deal and suggested that Ridley had obtained details about the murders not from any confession but from the police reports that Hampton kept in their shared cell.

Ross's credibility was also undermined. She admitted that she was intoxicated on methamphetamines at the time of the murder. The defense suggested that Ross's demeanor on the witness stand indicated that she was also using drugs during the trial. And the defense pointed out that she had reason to be angry at Hampton because, among other things, Ross had recently been in a romantic relationship with Findley until Hampton intervened to help Findley and Ramsdell reconcile their romantic relationship—a relationship that continued through the time of the murders.

Hampton's attorneys also chose to present a third-party culpability defense, although they only called one witness in support of that defense: Mark Sandon. Sandon had met Hampton twice and testified that he heard Tim Wallace, whom Sandon had never met before, confess to the murders. Wallace was the drug dealer for the residents of the house where Findley and Ramsdell were killed, and he was at the house on the morning of the killings according to Ross. Sandon testified that a month or two after the murders, he accompanied a friend to a motel room where they met with several other people, and that Wallace entered the motel room at some point. Sandon testified that Wallace said that

"Tracy [Hampton] didn't do anything," that Findley and Ramsdell had ripped Wallace off ("instead of paying me, they called the police on me"), and that he had "wacked the rats." But the State cast doubt on Sandon's credibility based on his felony convictions and his prior interactions with Hampton, and the State suggested that Sandon's testimony was implausible because Sandon had never met Wallace before hearing Wallace's confession.

## B.

Several other potential witnesses could have supported Hampton's defense that Wallace committed the murders but were not called to testify at trial.

Two potential witnesses, Keva Armijo and "Witness,"**[2]** were members of Hampton's and Wallace's social circle and would have testified that they heard Wallace confess to the murders. Armijo would have testified that when she was at a hotel watching the news with Wallace, Wallace bragged that Hampton was going down for what Wallace did. She also would have testified that Wallace said that he killed Findley and Ramsdell because Findley was a "[n]arc" and because Findley and Ramsdell were threatening Wallace's drug dealing business. Witness would have testified that she saw Wallace at a party outside an acquaintance's house, and that Wallace told her that he killed Findley and Ramsdell and warned that he would "deal" with anyone who talked about it the same way that he had dealt with Findley and Ramsdell. She also would have testified that she had heard Wallace accusing Findley of being a "snitch" and telling Findley that he owed him money.

---

[2] The state court entered a protective order to maintain the identity of "Witness" under seal due to her safety concerns.

One other potential witness, Jennifer Doerr, was a friend of Ross's and would have testified that Ross made inconsistent statements about what happened the day of the murders. She would have testified that Ross's story about the circumstances of Findley's death kept changing (including details about where the murder occurred and who was in the room when Findley was killed) and that at one point Ross told Doerr "I don't know who did it."

Hampton's attorneys for his guilt-phrase trial were lead counsel James Logan and second-chair Maria Schaffer. Schaffer was the attorney responsible for the third-party defense. Logan was aware of the three potential witnesses and had spoken to Doerr and Armijo. But Schaffer later testified during an evidentiary hearing held by the state PCR court that Logan never told her about the relevant information that those potential witnesses had shared with him. Logan testified that he did not recall why he did not call those witnesses, and Schaffer testified that there was no tactical decision underlying her failure to investigate and call them at trial. Schaffer testified that she would have wanted to present those witnesses in support of the third-party defense had she been aware of the contents of their statements.

## II.

I would hold that Hampton's guilt-phase trial counsel rendered ineffective assistance by failing to call Doerr, Armijo, and Witness, and that the state post-conviction relief ("PCR") court's conclusion to the contrary was an

unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).**[3]**

## A.

Under *Strickland*, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. To satisfy that benchmark, Hampton must establish that (1) "counsel's performance was deficient" and (2) that "the deficient performance prejudiced the defense." *Id.* at 687.

To establish that counsel performed deficiently, Hampton must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). In reviewing counsel's performance, we must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Establishing prejudice requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.*

---

[3] Because I conclude that Hampton's ineffective assistance of guilt-phrase trial counsel claim succeeds considering only the evidence that Hampton presented to the state PCR court, I do not discuss the evidence that Hampton presented for the first time in his federal habeas petition or whether that evidence could be considered.

Because Hampton's ineffective assistance of counsel claim was adjudicated on the merits in state court, AEDPA governs our review.  Under AEDPA, we defer to the state PCR court's decision unless that decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).**[4]**  Although that standard is difficult to meet, it "does not by definition preclude relief."  *Andrews v. Davis*, 944 F.3d 1092, 1099 (9th Cir. 2019) (en banc) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  If we determine that the state court erred under § 2254(d), we must assess the *Strickland* claim de novo.  *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

## B.

In the context of the evidence presented at trial, counsel's failure to call Doerr, Armijo, and Witness to the stand lacks any reasonable justification, and it was an unreasonable application of *Strickland* for the PCR court to hold otherwise.  The case against Hampton hinged on the testimony of two witnesses, one of whom—jailhouse informant Ridley—was so thoroughly impeached at trial that the majority here rejects Hampton's *Brady* and *Napue* claims on the ground that further impeachment evidence could not have made any difference.  That left the testimony of just one witness, Ross, to establish Hampton's guilt, and Ross

---

[4] I agree with the majority's conclusion that the state PCR court cited the correct *Strickland* standard.  Maj. Op. at 46-48.  The remaining question is thus whether the state court unreasonably applied *Strickland* or relied upon an unreasonable determination of fact.

also had serious credibility problems given her substantial drug use and likely anger at Hampton for helping her ex, Findley, reconcile with Ramsdell.  Yet Hampton's counsel presented the jury with very little evidence to counter Ross's version of events, and Hampton's defense would have been far more compelling if Doerr, Armijo, and Witness were called to testify.  *See Staten v. Davis*, 962 F.3d 487, 495-96 (9th Cir. 2020) (concluding that, given the minimal amount of evidence counsel had presented in support of third-party culpability defense, counsel performed deficiently by failing to present additional evidence from witnesses that would have bolstered counsel's chosen defense, and that the state court was objectively unreasonable in concluding otherwise); *Alcala v. Woodford*, 334 F.3d 862, 870-71 (9th Cir. 2003) (holding that counsel rendered deficient performance by failing to introduce witnesses whose testimony "would have been far more helpful" to counsel's chosen defense than the testimony offered).

Doerr's testimony would have undermined Ross's account of the murders.  Although Hampton's counsel had suggested at trial that Ross was unreliable because she was using methamphetamines at the time of the murders and likely had a grudge against Hampton for helping Findley get back together with Ramsdell, Doerr's testimony would have impeached Ross's credibility far more directly.  Doerr would have testified that Ross had previously claimed that she did not know who committed the murders and that Ross's story had been inconsistent in other significant ways, thereby directly undermining Ross's testimony about the murders.

Presenting Armijo and Witness also would have significantly increased the plausibility of Hampton's third-party culpability defense.  The jury would have heard three people, rather than just one, testify that Wallace confessed to

the murders.  Armijo and Witness also would have provided greater detail about Wallace's motive to commit the murders.  Sandon had noted at trial only that Wallace said that he killed Findley and Ramsdell because they ripped him off and called the police on him.  Witness could have further explained that Findley owed Wallace money, and Armijo could have added that Wallace considered Findley a "[n]arc" and that he was worried that Findley and Ramsdell, who had started selling drugs themselves, were intruding on his drug-dealing business.  And because Armijo and Witness were members of Hampton's and Wallace's social circle, they could have provided more information about Hampton's and Wallace's relationships with the victims to make the third-party defense more coherent and believable.  By contrast, Sandon, who was on the outskirts of that circle and had never previously met Wallace, provided the jury with little detail about the social dynamics of the group.

The state PCR court concluded that Hampton's counsel's failure to call Armijo, Witness, and Doerr was the result of tactical decisions because there was impeachment evidence available against each of them.  Specifically, the state court reasoned that (1) Armijo and Witness (who would have testified about Wallace's confession) had not actually witnessed the murders; (2) each of the potential witnesses may have been friends with Hampton, suggesting bias; (3) each of the potential witnesses may have been using methamphetamines, calling into question their reliability and credibility; and (4) the potential witnesses might have offered contradictory evidence.

That Armijo and Witness did not witness the murders is not a reasonable justification for counsel's failure to present their testimony.  Armijo and Witness would have corroborated Sandon's testimony about Wallace's

confession by providing additional evidence of Wallace confessing to the murders to different people. Sandon, who testified as to one such confession, did not purport to have witnessed Wallace killing Findley or Ramsdell, so he was no stronger of a witness than Armijo and Witness in that regard. It would not have been reasonable for Hampton's counsel to forego the chance to markedly strengthen Hampton's third-party culpability defense based on a defect that was shared by all three people who heard Wallace confess, including the witness they *did* present.

The potential witnesses' friendships with Hampton are also not reasonable grounds for the failure to call them. Ross too was a member of Hampton's social circle, which gave her similar bias problems. The State also argued that Sandon was biased due to his prior interactions with Hampton, so failing to present the other witnesses did not protect the defense from that line of argument. And, as explained above, the potential witnesses were in a better position than Sandon to counter Ross's testimony because their membership in that same circle gave them greater insight into what was going on between Hampton, Wallace, and the victims.

Next, the potential witnesses' drug use is no justification for keeping them off the stand because nearly all the witnesses in this case had the same problem. Sandon admitted on the stand to having a history of extensive drug use. And Ross, the State's most important witness, was using drugs during the murders and possibly during her trial testimony as well. It would not have been reasonable to fail to present a witness who could have shown that Ross contradicted herself simply because that witness also took drugs.

Finally, the record does not indicate that there would
have been inconsistencies or contradictions in the potential
witnesses' testimonies. The state PCR court found that
Witness would have contradicted Armijo as to the location
of Wallace's confession and Findley's involvement in drug
sales, but those findings are not reasonable interpretations of
the record. Armijo stated that Wallace confessed while they
were gathered in a hotel room doing drugs, and Witness
stated that she heard Wallace confess while at a house party.
Those different locations, as well as Armijo's and Witness's
differing accounts of what Wallace said, are not
inconsistencies but rather suggest that Wallace confessed on
multiple occasions. And Armijo's and Witness's statements
about Findley's drug-dealing were not inherently
contradictory—Armijo stated that Findley and Ramsdell had
started selling drugs, and Witness stated that Findley tried to
sell "here and there" but had "got[ten] himself more in debt
th[a]n he did above water." Neither of them described
Findley as a large-scale or sophisticated drug dealer. In any
event, minor inconsistencies in the witnesses' accounts
would not be a reasonable justification for failing to present
witnesses that would have made Hampton's key defense
plausible. *See Staten*, 962 F.3d at 496 (noting that "[i]t
would not have been a reasonable trial strategy" for the
defendant not to present his only strong evidence supporting
his third-party culpability defense "simply because the
witnesses' accounts were not consistent on every detail").

Having determined that the state PCR court
unreasonably applied *Strickland* and thus is not entitled to
AEDPA deference, I would hold that, under *Strickland*, there
is no other reasonable justification for Hampton's counsel's
choice not to present the testimony of Doerr, Armijo, or
Witness. Armijo and Witness would have made Hampton's

barebones third-party culpability defense more believable, and Doerr would have directly undermined Ross's testimony (the only somewhat credible evidence that connected Hampton to the murders). And Hampton's counsel had little to lose because the existing witnesses suffered the same or worse credibility problems as the potential witnesses. In other words, "[t]he potential benefit of introducing the evidence was high, and any disadvantage was negligible." *Id.* Given the thin evidence presented at trial, Hampton's counsel performed deficiently by failing to present the additional witnesses.

Unlike the majority, I also do not think that the record establishes that Hampton's counsel undertook a thorough investigation into the potential additional witnesses. The majority explains that "strategic choices made after thorough investigation" are "virtually unchallengeable." Maj. Op. at 49 (quoting *Strickland*, 466 U.S. at 689-90). But although the record shows that Hampton's lead counsel, Logan, contacted or attempted to contact each of the potential witnesses, the record does not establish that he thoroughly investigated their information—instead, Logan seemed to have failed to share that information with his co-counsel Schaffer, the lawyer tasked with developing Hampton's third-party defense. Moreover, *Strickland* focuses on the "objective reasonableness of counsel's performance." *Richter*, 562 U.S. at 110. As I have explained, counsel's decision not to present additional witnesses with important evidence that would have strengthened Hampton's defense, given the weakness of the evidence presented at trial, was objectively unreasonable.

The majority's additional concern about the witnesses' willingness to testify at trial is speculative and not the most natural reading of the record. The record does not indicate

that Armijo or Doerr were unwilling to testify. Armijo was forthcoming in her interview, appeared interested in helping Hampton's counsel get further information from other witnesses, and did not express a concern about testifying. And Doerr reached out to Hampton's attorneys of her own accord to share her information about Ross's inconsistent statements. The majority points out that Doerr was unwilling to disclose the name of the person to whom Findley owed money, but that need not have been within the scope of her testimony. And although Witness did appear to have safety concerns that might have affected her willingness to take the stand, there is no indication in the record that counsel attempted to persuade her to testify. The fact that Hampton's counsel had trouble reaching the potential witnesses on the eve of trial, multiple months after they had spoken, is more indicative of counsel's failure to properly pursue and prepare the witnesses than of their unwillingness to testify.

## C.

Turning to *Strickland*'s prejudice prong, there is a reasonable probability that Hampton would not have been found guilty if Hampton's counsel had presented the additional witnesses.[5] Given the very weak evidence presented on both sides of the case, a stronger defense would likely have affected the outcome. *See Thomas v. Chappell*, 678 F.3d 1086, 1103-06 (9th Cir. 2012) (holding that where the evidence against the defendant was not strong, the presentation of stronger evidence in support of defendant's

---

[5] Because the state PCR court concluded that counsel's performance was adequate, it did not decide whether prejudice was satisfied. I therefore analyze this prong de novo. *See Clark v. Arnold*, 769 F.3d 711, 730 n.9 (9th Cir. 2014).

third-party culpability theory had a reasonable probability of changing the outcome).

The additional witnesses would have made Hampton's defense much more plausible. As explained above, Doerr, if called, would have testified that the State's most important witness, Ross, had contradicted herself by saying previously that she did not know who committed the murders. Given that Ridley was completely impeached, impeaching Ross's account of the murders would have left the prosecution with essentially no credible evidence against Hampton at all. And Armijo and Witness would have significantly strengthened Hampton's third-party culpability defense by corroborating Sandon's testimony through additional evidence that Wallace had confessed to the murders. If the jury had heard from those witnesses, there is a reasonable probability that they would have acquitted Hampton. My own study of the record has certainly left me doubting that Hampton actually committed these murders.

For the foregoing reasons, I respectfully dissent.